**RECORD NO. 15-1747**

*In The*

# United States Court of Appeals

### For The Fourth Circuit

# MASOUD SHARIF,

*Plaintiff – Appellant*,

**v.**

# UNITED AIRLINES, INC.,

*Defendant – Appellee*,

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA**

––––––––––––

**BRIEF OF APPELLANT**

––––––––––––

**R. Scott Oswald**
**Andrea M. Downing**
**THE EMPLOYMENT LAW GROUP, P.C.**
**888 17th Street, NW, 9th Floor**
**Washington, DC 20006**
**(202) 261-2803**

*Counsel for Appellant*

**Richard T. Seymour**
**LAW OFFICE OF**
**RICHARD T. SEYMOUR**
**888 17th Street, NW, Suite 900**
**Washington, DC 20006**
**(202) 785-2145**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1294__        Caption: __Masoud Sharif v. United Airlines, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Masoud Sharif__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                ☐YES ☑NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
     If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____July 17, 2015_____

Counsel for: **Masoud Sharif**

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____July 17, 2015_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

H. Scott Johnson, Jr.
PCT Law Group, PLLC
330 John Carlyle Street, Suite 300
Alexandria, Virginia 22314
(703) 881-9141
sjohnson@pctlg.com

Angela H. France
PCT Law Group, PLLC
330 John Carlyle Street, Suite 300
Alexandria, Virginia 22314
(703) 881-9141
afrance@pctlg.com

_____
(signature)

_____July 17, 2015_____
(date)

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES .................................................................. vii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE.................................................................3

    1.    Statement of the Facts .............................................................3

        A.    Sharif's Imprisonment and Torture in Iran, and Panic
                Attacks..........................................................................3

        B.    Sharif Came to the United States and Worked for United..........5

        C.    Sharif's Panic Disorder Resurfaced in 2009, and United
                Granted Sharif's Request For Self-Declared Intermittent
                Leave Under the FMLA .............................................5

        D.    United's FMLA Protocols............................................6

        E.    Free or Discounted Travel .........................................7

        F.    Sharif's March-April 2014 Vacations........................8

        G.    Sharif's Panic  Attack When He Had No Means of
                Returning to Make his March 30 Shift .....................10

H.    United Officials Assumed Both Sharif's September 2013 and March 30, 2014 FMLA Requests Were Fraudulent, and Relied on Both Instances as Fraudulent Without Conducting Any Inquiry into the September 2013 FMLA Leave ................................................................................14

I.    Kenneth Martin's Investigation .................................................15

J.    Kenneth Martin's Interview of Sharif........................................15

K.    United Did Not Pay Sharif After April 23, 2014, in Violation of Kenneth Martin's Promise and the Collective Bargaining Agreement ............................................20

L.    United Fired Sharif.................................................................21

M.    United's June 5, 2014 IRH Hearing...........................................22

N.    The Union's Role at the Hearing and in the End of Sharif's Employment ................................................................23

O.    Kenneth Martin, the Union, and the Hearing Officer, All Make Jokes About the Situation .................................................24

P.    Martin Fired Another Employee for Using FMLA on a Workday Related to a Vacation .................................................25

Q.    Absence of Evidence of Any Employee Terminations for a Single-Day Absence on Which FMLA Leave Was Not Requested ..............................................................................26

2.    Statement of Proceedings ................................................................26

SUMMARY OF THE ARGUMENT ....................................................................28

STANDARD OF REVIEW ...............................................................................29

ARGUMENT .................................................................................................29

A.    Proof of FMLA Retaliation Claims....................................................29

B.    Sharif Presented Direct Evidence of FMLA Retaliation ...................29

C.    Other Evidence Supports the Direct Evidence....................................31

      1.    Departures from Normal Procedures and Standards ...............31

      2.    Comparator LaTonya Love-Franks ...........................................32

      3.    Evidence that United Did Not Care Much About Single-
            Day Absences, Except in the Context of FMLA ......................33

      4.    Martin's "Investigation" Was So Unbusinesslike, and So
            Far from a Common-Sense Inquiry, That it is Evidence
            of Animus and Pretext ..............................................................33

D.    This Circuit Allows a Combination of Direct and Indirect
      Evidence, as an Alternative to the *McDonnell Douglas*
      Approach ..............................................................................................35

E.    Sharif Established a *Prima Facie* Case Under the *McDonnell
      Douglas* Approach...............................................................................35

F.    The Grant of Summary Judgment Violated the Standards Set by
      the Supreme Court and this Court........................................................36

G.    The Lower Court Improperly Gave Weight to the Testimony of
      Interested Witnesses ............................................................................37

H.    The Lower Court Improperly Invaded the Province of the Jury by
      Declaring Defendant's Officials Honest and Saying They Had an
      "Honest Belief" ....................................................................................39

      1.    The Confused Underpinnings of the "Honest Belief"
            Rubric.........................................................................................39

      2.    The Lower Court's Cases Actually Favor Sharif More
            than United ................................................................................42

v

3.    A One-Day Absence Would Not Have Motivated United to Fire Sharif if He Had Not Asserted FMLA Rights ............... 46

4.    Badly-Flawed Investigations Are Evidence of Pretext, and Martin's Investigation was Badly Flawed ........................ 47

5.    The Irregularity of Martin's Proceedings Are Evidence of Retaliatory Animus and Pretext ................................................. 54

I.    The Lower Court Gave Unwarranted Deference to United's Claim of an "Honest Belief" ............................................................. 54

CONCLUSION ....................................................................................... 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brinkley v. Harbour Recreation Club,*
180 F.3d 598 (4th Cir. 1999) ........................................................35

*Bruso v. United Airlines, Inc.,*
239 F.3d 848 (7th Cir. 2001) ........................................................53

*Burley v. National Passenger Rail Corp.,*
— F.3d —, 2015 WL 5474078 (D.C. Cir. Sept. 18, 2015) ...........53

*Cline v. Wal-Mart Stores, Inc.,*
144 F.3d 294 (4th Cir. 1998) ........................................................29

*DeJarnette v. Corning Inc.,*
133 F.3d 293 (4th Cir. 1998) ........................................................44

*Edell & Associates, P.C. v. Law Offices of Peter G. Angelos,*
264 F.3d 424 (4th Cir. 2001) ........................................................39

*E.E.O.C. v. Sears Roebuck and Co.,*
243 F.3d 846 (4th Cir. 2001) ........................................................42

*Giannopoulos v. Brach & Brock Confections, Inc.,*
109 F.3d 406 (7th Cir. 1997) ........................................................43

*Higgins v. E.I. DuPont de Nemours & Co.,*
863 F.2d 1162 (4th Cir. 1988) ......................................................29

*Jacobs v. N.C. Administrative Office of the Courts,*
780 F.3d 562 (4th Cir. 2015) ....................................35, 36, 55, 57

*Laing v. Fed. Exp. Corp.,*
703 F.3d 713 (4th Cir. 2013) ........................................................29

*Lowery v. Circuit City Stores, Inc.*,
    206 F.3d 431 (4th Cir. 2000) .........................................................................53

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)...........................................................................29, 35, 42

*Miller-El v. Dretke*,
    545 U.S. 231 (2005)......................................................................................55

*Moffat v. Wal-Mart Stores, Inc.*,
    — Fed. Appx. —, 2015 WL 4880135 (6th Cir. Aug. 17, 2015) ..................46

*Murphy v. Ohio State Univ.*,
    549 Fed. Appx. 315 (6th Cir. 2013) ...................................................44, 45, 46

*O'Neal v. City of New Albany*,
    293 F.3d 998 (7th Cir. 2002) ........................................................................47

*Rachells v. Cingular Wireless Employee Services, LLC*,
    732 F.3d 652 (6th Cir. 2013) ...................................................................47, 52

*Radentz v. Marion County*,
    640 F.3d 754 (7th Cir. 2011) ........................................................................52

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000).................................................................38, 40, 55, 57

*Rhoads v. F.D.I.C.*,
    257 F.3d 373 (4th Cir. 2001), *cert. denied*,
    535 U.S. 933 (2002).......................................................................................35

*Russell v. McKinney Hosp. Venture*,
    235 F.3d 219 (5th Cir. 2000) ........................................................................32

*Seeger v. Cincinnati Bell Telephone Co., LLC*,
    681 F.3d 274 (6th Cir. 2012) .................................................................44, 45

*Smith v. Chrysler Corp.*,
    155 F.3d 799 (6th Cir. 1998) ........................................................................44

*Soto-Feliciano v. Villa Cofresi Hotels, Inc.*,
  779 F.3d 19 (1st Cir. 2015)....................................................................48, 49

*St. Mary's Honor Center v. Hicks*,
  509 U.S. 502 (1993)....................................................................................40

*Staub v. Proctor Hospital*,
  562 U.S. 411 (2011)......................................................................41, 42, 56

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002)....................................................................................42

*Tolan v. Cotton*,
  —— U.S. ——, 134 S. Ct. 1861 (2014) .......................................................36

*Trans World Airlines, Inc. v. Thurston*,
  469 U.S. 111 (1985)....................................................................................42

*United States v. Arvizu*,
  534 U.S. 266 (2002)....................................................................................56

*United States v. Ashley*,
  606 F.3d 135 (4th Cir. 2010), *cert. denied*,
  562 U.S. 987 (2010)....................................................................................51

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977)......................................................................31, 32, 57

*Waste Management Holdings, Inc. v. Gilmore*,
  252 F.3d 316 (4th Cir. 2001) .....................................................................39

*Wexler v. White's Fine Furniture, Inc.*,
  317 F.3d 564 (6th Cir. 2003) ..............................................................34, 48

*Wichmann v. Bd. of Trustees of Southern Ill. Univ.*,
  180 F.3d 791 (7th Cir. 1999) ..............................................................34, 48

*Williams v. Hansen*,
  326 F.3d 569 (4th Cir. 2003), *cert. denied*,
  540 U.S. 1089 (2003)..................................................................................32

ix

## **CONSTITUTIONAL PROVISION**

U.S. Const. amend. IV ................................................................56

## **STATUTES**

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1331 ....................................................................1

29 U.S.C. § 2601 *et seq.* ........................................................1

29 U.S.C. § 623(d) ................................................................26

38 U.S.C. §§ 4301 *et seq.* ....................................................41

## **RULES**

6th Cir. R. 32.1(b) ................................................................45

Fed. R. Civ. P. 30(b)(6)..........................................................6

Fed. R. Civ. P. 50 ................................................................38

Fed. R. Civ. P. 56 ............................................................38, 55

## **OTHER AUTHORITY**

9A C. Wright & A. Miller, Federal Practice and Procedure § 2529
(2d ed.1995) ........................................................................38

## <u>STATEMENT OF JURISDICTION</u>

The United States District Court for the Eastern District of Virginia had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331. Plaintiff Masoud Sharif's ("Sharif") claim arose under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to hear this appeal from the District Court's final decision on July 1, 2015, granting Defendant United Airlines' ("United") Motion for Summary Judgment.

On July 2, 2015, Plaintiff timely filed a notice of appeal.

## <u>STATEMENT OF THE ISSUES</u>

1.    Whether the "honest belief" rubric in employment discrimination cases applies where a plaintiff has shown direct and indirect evidence of retaliation, where the person whose honesty is in question has been shown to harbor animus, or where there is substantial direct and indirect evidence of retaliation, or where the asserted "honest believer" is an interested person whose testimony the jury would not be required to believe.

2.    Whether the "honest belief" rubric in employment discrimination cases applies where the asserted belief arises from an "investigation" so incomplete and one-sided that it did not allow a reasonably informed and considered decision.

3.    Whether the "honest belief" and other defense-favoring rubrics justify a court in (a) weighing the evidence, deciding credibility, and drawing inferences, all on behalf of the movant for summary judgment, (b) disaggregating plaintiffs' evidence and, as to each item, developing possible rationales under which it might not be probative.

## STATEMENT OF THE CASE

### 1.     Statement of the Facts

### A.     Sharif's Imprisonment and Torture in Iran, and Panic Attacks

Sharif testified without dispute that he was imprisoned by the Islamic Republic of Iran in 1981 for the "offenses" of having been a VIP Flight Attendant on Iranian Airlines flights carrying members of the Shah's government and family, of his wife's father's having been a Colonel in the Iranian Army, and of his wife's flight from Iran.  (Sharif Deposition, JA 458:4 to 461:21).  Sharif's sworn EEOC charge, (JA 635-643), stated he was imprisoned for "just under a year," and was persecuted and tortured during that time.  (*Id.*, JA 636 ¶ 6).  He testified in his deposition that "thinking about it still now with that little space in the room that they put you in there, and they come and, you know, prosecuting you, forcing you, beating you up."  (JA 460:12-15).  Sharif was only able to get out of prison by divorcing his wife and severing connections with her relatives.  (*Id.*, JA 460:20 to 461:3).  Roughly six months later, he fled Iran through the mountains.  (*Id.*, JA 461:7-9).

As a result, Sharif began suffering panic attacks disabling him from ordinary activities.  (*Id.*, JA 460:15-18).  He testified about what happens when he has an attack (*id.*, JA 469:20 to 470:6):

> You're pulsing, your heartbeat goes up, so you start sweating. It's like
> a heart attack.  You have to calm down, your pulse goes up, you're

running around, you're sweaty, you got to sit down, you got to do something.  You got to take your medication, you got to change your environment.  You have to quickly go away from that picture, that environment. You have to go away. You have to break away.

His wife, Fereshteh Sharif, described the attacks similarly in her deposition

(JA 710:15 to 711:1):

Q Can you briefly describe the types of symptoms that your husband has when he is suffering from anxiety?

A He kind of gets – first he gets a headache and he starts sweating and he starts – I can feel that his heartbeat is going very fast and then he is like a chicken walking around without a head, you know, just going like why, why, why. That's how I know that something is going on.

Dr. Tara Mangat testified in his deposition that he is a psychiatrist licensed

in Virginia (JA 695:14-18).  Mangat is Sharif's treating psychiatrist.  (JA 463:11-

22).  He described Sharif's panic attacks (JA 697:7-22):

A When somebody has anxiety only or depression only, that does not mean necessarily he has panic attacks. When anxiety gets uncontrolled or doesn't work, or whatever the cause of anxiety is, then person can have panic attacks. The trigger could be stress. Trigger could be a strange kind of situation that he's in, or she is in. So that's panic. That's the physical symptoms of panic attack.  The person have chest pain. Sometimes it can mimic even a heart attack. People sweat. People shake. They have paresthesia, there's numbness. So there are a lot of symptoms of those. Those symptoms you do not see each and every time you see the patient.

Q So with respect to Mr. Sharif, what symptoms did he exhibit?

A Similar symptoms I just described.

**B.** **Sharif Came to the United States and Worked for United**

Sharif testified that he came to the United States in 1982 (JA 448:13-14).

He started working for United on April 16, 1990, as a Reservation Sales

Representative in Sterling, Virginia. (JA 448:18 to 449:3). In the late 1990s, Sharif

was promoted to Service Director in the same location, supervising reservations

sales agents and handling irate customers. (JA 450:20 to 451:11).

Sharif transferred to Dulles Airport in about 2004 as a Customer Service

Representative ("CSR") and was again promoted to Service Director a few months

later. (JA 451:18 to 452:9). From about two years before June 2014, he worked as

Service Director for the four United Club lounges at Dulles. (JA 454:5-17). In

Sharif's job classification, there are 40 to 50 full-time Service Directors at Dulles,

with a total of about 100 Service Directors when part-time employees are included.

(JA 23:6-17).

**C.** **Sharif's Panic Disorder Resurfaced in 2009, and United Granted Sharif's Request For Self-Declared Intermittent Leave Under the FMLA**

Sharif stated in his sworn EEOC charge that his panic attacks began again

after United disciplined him in 2009 – in a manner he believed unjust – by

suspending him for two weeks and demoting him for two years, that he began to

see a therapist to manage his problems, and that he was diagnosed with "panic

disorder, general anxiety disorder, and acute stress disorder.[1]  (JA 637 ¶¶ 13-23;

Sharif deposition, JA 462:1 to 465:8).

In 2009, Sharif requested intermittent FMLA leave, so he could take leave as

necessary to manage his anxiety.  (Sharif Deposition, JA 471:11 to 472:2).  On

June 22, 2009, United approved for one year his taking intermittent FMLA leave

for "1-2 episodes month Duration 1-7 days per episode."  (JA 551). United

approved Sharif's initial request, and each subsequent annual request, allowing

Sharif to take FMLA leave once a month, for a period of one to five days.

(Defendant's Memorandum, Statement of Undisputed Facts, JA 112, ¶8; Plaintiff's

Response, JA 409).

United's June 10, 2013 approval of Sharif's renewed request stated he was

approved for a year to take intermittent FMLA leave "Up to 1 time per month for a

duration of 1 day to 5 days."  (JA 267).

### D.    United's FMLA Protocols

Carlos Rivera, United's Manager of Employee Service Center Operations

and United's Rule 30(b)(6) designee, testified that to utilize approved FMLA

intermittent leave, employees are required to notify their local manpower offices of

an absence by calling a specific telephone number, providing dates of their

absences, and providing their FMLA case number. (JA 564:10 to 565:13).   He

---

[1] The details of the 2009 incident are not material to this appeal.

stated that if an employee's leave usage is outside of an employee's approved parameters, United sends the employee a recertification letter, advising that current usage is inconsistent with approved parameters, and the employee is then required to submit a statement from a healthcare provider, asking for an adjustment to the frequency and duration of FMLA leave. (JA 566:15 to 567:2).

### E.   Free or Discounted Travel

Kenneth Martin testified in his deposition that pass benefits enabling free or discounted travel are a major driver of employee compensation.  Retirees with sufficient age and service can receive lifetime pass benefits.  (JA 594:7-13). Employees and retirees with pass benefits can fly standby on other airlines with discounted "ZED" fares.  (JA 668:3-14).  Employees and retirees with pass benefits can fly United with their families just by paying the taxes on their fares. (Sharif Deposition, JA 489:14-16).

The free travel on United and discounted ZED travel on other airlines is standby travel.  When standby travel is booked, the traveler does not know if there are any empty seats at the time of the booking, or at the time of the flight.  Multiple standby bookings may be necessary to be sure of departing.  The traveler does not know in advance if the flight that will work, the airline that will succeed, or even the direction of the flight or even the connecting city or country.  (JA 490:17 to 495:18).  When possible, Sharif booked standby flights with connecting cities

where there were family members, so if they could not make their connecting flight they at least had a place to stay.  (JA 525:8-13).

Sharif's travel relieves his anxiety, helps him clear his system of the medications he takes for anxiety, and helps him get back to a normal level. (Deposition of Fereshteh Sharif, JA 711:19 to 712:21).

Sharif considered himself an expert on booking standby flights because of his years of experience in reading and understanding airline schedules and information.  (JA 493:2 to 494:11).  In nearly 24 years of employment with United before March 2014, he had never missed a day of work because of a flight scheduling problem.  (JA 483:1-6; JA 514:15 to 515:3).

United's firing of Sharif would have barred him from all pass travel, even as the husband of Fereshteh Sharif, also a United employee.  (JA 378).

### F.   Sharif's March-April 2014 Vacations

Sharif and his wife planned a trip to South Africa from March 16-29, 2014, and a separate trip to Pittsburgh to gather with family for the Persian New Year from April 1-5, 2014, with Sharif working the two days in between, March 30 and 31.  (JA 476:11-19 and JA 480:14 to 481:3).

Sharif posted the availability of his March 30 and 31, 2014 shifts on a United shift-swap website.  (JA 478:7-10; JA 481:4- 483:12).  On March 23, 2014, another United employee accepted Sharif's March 31, 2014 shift. (JA 478:3-10).

8

Sharif and his wife coordinated their trip to South Africa with his niece, her husband, and their adult daughter. (JA 474:17 to 475:1). Sharif arrived in South Africa on March 18, 2014. (JA 476:6-7). The Sharifs first stayed in Johannesburg for eight days, where they visited Kruger National Park. (JA 475:18 to 476:1). On March 26, 2014, the Sharifs traveled from Johannesburg to Cape Town for the second leg of their trip. (JA 496:9 to 498:6). At this time, Sharif learned of an international jazz festival in Cape Town(JA 177:13-178:7), and decided to start back to the United States on March 28 instead of March 29, so he would have two days to get back. (JA 498:21 to 499:12).

Sharif and his wife arrived at the Cape Town airport early in the morning of March 28. (JA 499:13-15). Their first set of options, before they learned of the Lufthansa strike, had been to return from Cape Town to Dulles by way of Dubai, arriving at Dulles by the morning of March 29. (JA 504:17 to 508:9). Sharif planned to take a flight to a city from Cape Town to a city where United flew. (JA 185:3-9).

When they arrived at the Cape Town airport, however, they learned that Lufthansa pilots were planning to go on a three-day strike, starting April 2. This meant that the airlines for many passengers would have notified them and re-arranged their schedules to get them on other flights. That put pressure for seats on the flights that the Sharifs could take, and the central ticket counter at the airport

told them that flight after flight was sold out.  (JA 499:17 to 501:16; JA 504:13-14).  Sharif offered to pay several airlines full fare for a standby ticket, to get him back to Dulles in time for his work shift.  Airline after airline turned him down.  There was no room on any connecting flight to any city that could have gotten them back to the United States in time for his work shift.  (JA 501:17 to 504:3).  The Sharifs spent the night of March 28 at the airport.  (JA 508:10-12).

Sharif's efforts on March 29 had the same results.  Flight after flight was sold out, and he could not buy a ticket to get him back.  (JA 508:13 to 510:20).  When Sharif missed the last flight that would have gotten him back in time for his shift, a British Airways flight leaving about 7:00 P.M., he tried to get a KLM flight that would have gotten him back about two and a half hours after the start of his shift.  That flight, too, had no seats.  (JA 511:15 to 514:14).  Fereshteh Sharif confirmed her husband's account in her deposition.  (JA 716:11 to 719:22).

## G.   **Sharif's Panic  Attack When He Had No Means of Returning to Make his March 30 Shift**

Sharif testified that he had felt the pressure building over the two days of unsuccessful efforts to get back to Dulles for his shift, and he had a panic attack after the KLM flight left.  (JA 514:12 to 516:7).  He described it:

> It's – at that time I am getting – I feel like – getting like a heart attack because I lost all of my hope. I am sweating, I am – Mr. Johnson, someone like me for 24 years, who have not had one day absent, not one day off the work,  unauthorized work, and I was proud of that – 24 years for the company, not one day unauthorized absence. And I

was expert on these things, prediction, but this time it was out of my control.

Q So your 24 days (sic) of work –

A Anxiety – right.

Q – 24 years without missing a day, and your anxiety started once the KLM flight was sold out?

A No. It started from the 28th in the morning. It started – it kicked in, it built up.  Anxiety doesn't just pop, it builds up inside yourself. (JA 514:17 to 515:12).

He later stated: "We were stranded. I was totally in a panic situation, my pulse, my

sweating."  (JA 516:6-7).

The Sharifs had now spent two days at the airport and were about to spend a

second night there.  It was hot, and they got together with four other stranded

passengers to rent a day room at the airport so they could all take showers.  Sharif

went back out into the airport after taking his shower.  (JA 515:2 to 517:22).  They

stayed at the airport until 7:00 A.M., because they could not get into a hotel room

until the afternoon.  ( JA 518:1 to 519:21).  In the meantime, he testified:

So my anxiety is getting worse and worse.  It's getting worse and worse. And I am so desperate, my wife is worried about me, that I'm going to get a heart attack. So I have, of course, my medication with me everywhere I go. I'm taking my medication and trying to think.

(JA 518:1-6).

Sharif then testified about his calling in to take FMLA leave, at about 7:00

A.M. Cape Town time:

> Q This is at 1:00 a.m. on the 30th?
>
> A This is 1:00 a.m. But we stayed there till about 7:00 a.m. at the airport. 7:00 a.m., I was feeling very bad. And we were thinking. My wife says, My dear, you have FMLA. You're entitled. You are sick now. You're getting heart attack. You're almost looking like you're getting heart attack. Why don't you call in and then use your FMLA.
>
> Q For which day, for March 30th?
>
> A The 30th, right.

(JA 519:1-10). Sharif did call United and report that he was taking FMLA for

March 30. (JA 519:11-17). Sharif was too sick to fly on March 30, but in any

event an early flight on March 30 would not have gotten him back to Dulles in

time for his shift. (JA 520:15 to 521:13).

The record does not show any motive that Sharif would have had for falsely

requesting an FMLA day. If Sharif had not made the telephone call to report that

he was taking FMLA leave, he would still have his job and benefits. Kenneth

Martin testified in his deposition that the penalty for "not showing up for work" is

that United would have penalized him three points, which would have been erased

after twelve months. (Kenneth Martin deposition, JA 580:20 to 581:10; United

Attendance Policy, JA 836). If an employee simply calls in sick, there is only a

one-point penalty. That is considered reporting a personal absence. (JA 580:2-6

12

and 582:14-19; JA 833, 836).  The record shows that Sharif had a sufficient sick-leave balance that he would have been paid for his time if he had simply called in sick rather than calling in on FMLA.  (Sharif pay record, JA 822).

On March 31, the Sharifs returned to the airport to get a flight connecting to the U.S.  They found the same situation as before, and it was "very disappointing." They were only able to get out of Cape Town when two passengers on a flight to Dubai were barred from the flight because they did not have valid visas.  The Sharifs arrived in Dubai at 1:00 A.M. on April 1, 2014.  (Sharif Deposition JA 523:8 to 524:21).  They tried to get back to the United States, but the immediately available flight was one two hours later for Milan, arriving on the morning of April 1.  Sharif tries to choose connecting cities where there are relatives or friends, so there is a place to stay if they cannot get a flight, and he had a niece who was a student in Milan.  (JA 524:20 to 525:22).  The Sharifs arrived in Milan and tried to get to the United States the same day, but the Lufthansa strike meant that flights were full.  They tried again on April 2, but could not get out.  They tried again on April 3, and arrived in Washington on the morning of April 3.  (JA 526:1 to JA 527:14).

13

**H.** **United Officials Assumed Both Sharif's September 2013 and March 30, 2014  FMLA Requests Were Fraudulent, and Relied on Both Instances as Fraudulent Without Conducting Any Inquiry into the September 2013 FMLA Leave**

On March 31, 2014, Suzanne Hasser, a Senior Coordinator in United's

Dulles Employee Resource Center, emailed several United employees stating that

Sharif "called out FMLA yesterday, Sunday. This was the only day he didn't have

covered for his vacation trip out of the country….He did the same thing last

September, 2013. Just an FYI." (JA 721).

The record does not contain any evidence that Hasser knew of anything

improper about Sharif's calling in for FMLA leave in September 2013.  Hasser's e-

mail just relied on the fact Sharif had taken the FMLA leave.  (*Id.*).

Kenneth Martin is United's Senior Manager of Human Resources at Dulles

Airport.  (JA 63).  He testified that he could not recall the date of Hasser's email,

but recalled the following': "It said based – roughly, that Mike had called out sick

on a day that he didn't have covered; he's done this before – . . . something to that

effect." (Martin Deposition, JA 605:6-14).  Based on this, Martin decided to start

an investigation into Sharif's use of FMLA leave.  (*Id.*, JA 605:15-19).

While Martin relied on Sharif's having taken FMLA leave in September

2013 when he decided to commence his investigation, there is no evidence in the

record that he ever investigated the propriety of the September 2013 FMLA leave.

There are no questions about the 2013 FMLA leave in Martin's interview notes of

14

his meeting with Sharif on April 23, 2014; instead, all his substantive questions concerned 2014, and did not assert any impropriety as to the September 2013 FMLA leave. (JA 344-345). Martin's May 2, 2014 recommendation that Sharif be fired focused only on 2014. (JA 376). Jon Connor's May 14, 2014 letter firing Sharif referred only to the March 30, 2014 FMLA leave and did not assert any impropriety as to the September 2013 FMLA leave. (JA 377-378).

## I.    Kenneth Martin's Investigation

Kenneth Martin's investigation of Sharif's use of FMLA leave on March 30, 2014 consisted of (1) pulling block flight schedules, (2) getting United's PDI reservation information, (3) looking at Sharif's work (MARS) calendar, (4) asking corporate security to find out the number from which Sharif made his FMLA call, and (5) conducting an interview with Sharif. (Kenneth Martin Deposition, JA 605:20 to 610:5). Martin asked Jon Connor, Sharif's second-level manager, to set up the date and time for the interview. (JA 608:7 to 610:5).

Martin could not tell anything from United's PDI information. He stated: "And I, technically, really don't know what it means." (JA 606:10-11).

## J.    Kenneth Martin's Interview of Sharif

United's collective bargaining agreement with Sharif's union states in relevant part:

> If the Company intends to question a non-probationary employee as part of an investigation that, with reasonable foreseeability, could

result in discipline against that employee, the Company will inform the employee that he/she has the right to have a Union representative present during the questioning. If the employee elects to have a Union representative present, the Union representative will not interfere with the Company's questioning, but at the conclusion of the Company's questioning will be given an opportunity to ask clarifying questions. The Union representative will be afforded a reasonable opportunity to consult with the employee before questioning begins.

(JA 254 ¶ A(3)).

Instead, Sharif went to work on April 23, 2014 without any indication there would be a disciplinary interview. The union did not consult with him in advance. He did not know what the interview would be about. All he knew is that, when there was to be a disciplinary meeting, the union representative was supposed to get the employee and go to the meeting with the employee, which would have given an opportunity for consultation. Instead, his supervisor Elizabeth Trainum was there, telling him that Jon Connor wants to talk to him and calling to him, "Let's go, Mike." Trainum did not take him towards Connor's office, but down into the Human Resources area. Sharif started to get "that motion sickness thing," wondering why they were going there. In a small office, he was introduced to Kenneth Martin, and told he was the Human Relations Manager. He also saw Bill Huston, the union shop steward, just sitting there. Every one of the three managers had papers in front of them, and he had nothing. It "took me back to my 1980s cell persecution area . . . ." (Sharif Deposition, JA 528:13 to 531:15).

16

Martin's notes show that he began by asking Sharif how long he had worked for United (24 years) and for his address and phone number. (JA 344). He did not begin by explaining what the interview was about. (*Id*.).

Sharif testified that he started to have a panic attack when Martin started asking him about the South African trip and whether he had been scheduled to work on March 30. Martin did not show him the calendar. He stated:

> And suddenly Mr. Ken Martin asked me, Oh, okay, how about South Africa? You were on a trip there. Okay. Were you scheduled to work on the 30th of March? I'm having already the panic attack. I don't even get a chance to ask him, Do you remember – I mean, do you remember like what you had for your lunch two days ago or where you've been three days ago? So without presenting me any – any paper, anything that, you know, that – so I just at that moment, I get the attack right there again, because the symptoms is with me, and I just tell him no in error and mistake. I'm human. And I am already under attack in the situation. Without tricking me, bringing me – instead of talking to me and asking me what happened, I am your premium employees for 24 years, your service director, I work for this company, and how you are treating me, like tricking me, bringing me down and talking to me like that.

(Sharif Deposition, JA 531:19 to 532:15). The District Court noted that this line of questioning caused Sharif to suffer a panic attack. (JA at 926).

Martin's notes showed that after "many pauses" and a "long thought process," Sharif said he did not remember if he or his wife called in sick. (JA 344 to 345). At one point, Martin accused him of changing his "story." (JA 345). Martin was the only other person who spoke; none of the rest asked any questions. (JA 344-345; JA 534:3-18).

17

Martin asked Sharif to write out a statement about the incident. (JA 327:14-15; 535:12-19). Sharif's statement described his efforts to get out of Cape Town on March 29 and stated that he suffered a panic attack and was sick on March 30. (JA 772; handwritten statement read into the deposition transcript at JA 537:1-21).

Martin did not ask Sharif when Sharif had planned to come home from his vacation, did not ask Sharif any follow up questions about Sharif's assertion that he used FMLA on March 30, 2014 because he had anxiety, did not try to research whether Sharif had anxiety, did not ask Sharif any questions about his written statement, and conducted no further investigation into Sharif's conduct after he read Sharif's statement. (JA 531-32; 534). Martin did testify that he took contemporaneous notes during the April 23, 2014 that included all matters discussed with Sharif in that meeting. (JA 624 to 625).

Connor testified that during the April 23, 2014 meeting, Sharif stated that he and his wife attended the jazz festival, which Sharif did not testify to. (JA 355:12-356:1; 496:4-6; 715:7-21). And, this statement is not reflected in Martin's notes. (JA 723-24).

Martin then shredded his notes after typing them a day or two after the April 23, 2014 meeting. (JA 871:2-6). Martin also testified that he never asked Sharif if he attempted to leave Cape Town prior to March 29, 2014. (JA 329:10-20). Lastly, Martin testified that he at no time researched whether Sharif suffers

18

from a diagnosed anxiety disorder or completed any investigative items following the April 23, 2014 meeting. (JA 617:3-9).

Connor testified that Sharif's body language and demeanor appeared nervous but casual during Martin's preliminary questions in the April 23, 2014 meeting, which was apparent to Connor because he "had known Mike for quite a period of time, and you get to know someone's body language when they're relaxed and when they're under more stress, and he was displaying signs that I had seen before being nervous." (JA 666:3-17). Similarly, Trainum, who has known Sharif since the early 1990s, testified that a change in Sharif's "everyday demeanor [due] to being asked a lot of questions" made Sharif "seem nervous" during the meeting. (JA 787:13 to 788:4).

Regarding Sharif's "reaction to the meeting," Martin testified that Sharif was "very calm; smooth" and "friendly" and "jovial" during Martin's preliminary questions in the April 23, 2014 meeting. Martin also testified that when he asked Sharif why he called out if he wasn't scheduled to work, Sharif was "very silent" and "very calm" for minutes, Sharif's response was not "anxious,"; and Sharif's answers did not show "any indication of unrest or anything like that." (JA 323:14 to 325:16).

Martin and Connor both testified that they did not believe Sharif's account of his attempts to leave Cape Town in March 2014. (JA 620:1-10

19

675:12-16).  Martin also testified that Trainum did not think Sharif was being truthful during the April 23, 2014 meeting. (JA 630:14-21).  Yet, Trainum testified that she believed what Sharif said during the April 23, 2014 meeting, that "there was a jazz festival, and it was busy, and he [Sharif] couldn't get on any flights, and he was stressed, and he has a – because of his stress, he took FMLA that day." (JA 791:6-21).  Martin testified that Trainum did not "directly" tell him that and that she never came to him to "disagree with the actions we were going to take against him [Sharif]." (JA 632:10-14).  Martin also never told Trainum about the actions he was going to take against Sharif. (*Id.*)

At the direction of Martin, Connor and Trainum took Sharif's access card and escorted him off the property. (JA 334:14-18).

### K.    **United Did Not Pay Sharif After April 23, 2014, in Violation of Kenneth Martin's Promise and the Collective Bargaining Agreement**

Martin and Connor both testified that on April 23, 2014, Sharif was suspended with pay. (JA 333:5-7; 670:8 to 671:10).  However, upon returning home, Sharif logged into United's intranet site which stated he was suspended without pay.  (JA 208:16-21). On April 24, 2014, the day after the hearing, Sharif emailed Martin inquiring if his employee status was incorrectly listed as suspended

without pay. (JA 729). Sharif's pay stubs show that Martin failed to take any

corrective action. United did not pay Sharif after April 23, 2014. *(JA 822-824).*

United's Collective Bargaining Agreement states "Employees held out of

service pending investigation of disciplinary charges will incur no loss of pay."(JA

818). Specifically it reads:

> Employees held out of service pending investigation of disciplinary
> charges will incur no loss of pay, except that employees may be held
> out of service without pay when charged with any of the following:
> (1) being arrested for or charged with a disqualifying criminal offense
> that falls under the jurisdiction of the airport or city where the
> employee works; (2) participating in an unlawful or prohibited job
> action; (3) refusal or adulteration of a drug or alcohol test; (4)
> insubordination, or refusal to obey a direct order that is not safety-
> related; (5) refusal to participate in a Company investigation; (6) an
> act or threat of abuse or violence; (7) an act of fraud; or (8) use or
> possession of alcohol, illegal drugs, or weapons on Company
> property.

### L.    United Fired Sharif

Following the April 23, 2014 meeting with Sharif, Martin met with Connor

to discuss the April 23, 2014 meeting, including "what was said" [by Sharif],

Sharif's "reaction," and "the whole interview itself." (JA 615:11-16). Martin

could not recall whether he or Connor first suggested terminating Sharif's

employment. (JA 616:16 to 617:2). Martin then testified that Connor drafted

Sharif's termination letter and sent it to Martin to review. (JA 622:3-4). But,

Connor testified that the termination "letter was prepared by Ken Martin" and then

sent to Connor to present to Sharif. (JA 680:12-21).

On May 6, 2014, Martin wrote to several of Sharif's managers and stated that Sharif's separation was "involuntary," that Sharif was "being terminated," and that his "expected termination date" was May 14, 2014. (JA 794-96).

Connor summoned Sharif to United's Dulles offices on May 15, 2014 and presented Sharif with the termination letter. (JA 681:2-12). The letter terminated Sharif's employment "effective today" and required Sharif to "return all items of Company property to me [Connor] immediately." (JA 726-27). The letter's reason for termination states:

> Our investigation shows that you violated this policy and fraudulently claimed an FMLA qualifying illness as the reason for your absence on a day that you were scheduled to work and that you did not have coverage for when you left the United States. It is clear that you left for vacation with no intention of coming to work on March 30, 2014.

(JA 727).

Further, Connor testified that when presenting Sharif with the termination letter, Sharif "went into his experience living in Iran…and he [then] looked at me and said I appeared to him now to be a mullah from Islamic faith." (JA 681:15 to 682:8). An Investigative Review Hearing was then scheduled for June 5, 2014. (JA 368:10 to 369:4).

## M.    United's June 5, 2014 IRH Hearing

United's Statement of Undisputed Facts in support of its summary judgment motion stated that the collective bargaining agreement required United to provide

union employees with a "prompt, fair and impartial investigative hearing" ("IRH"), at which the employee was entitled to be represented and assisted by Union representatives."  (JA 119 ¶ 46).  United named an employee, David Merriman, as the hearing officer and scheduled the hearing for June 5, 2014.  (JA 120 ¶ 50).

Four union representatives attended the hearing.  They "repeatedly advised Plaintiff that he should retire as it was unlikely, in their opinion, that the IRH decision would be favorable to him."  (JA 120 ¶¶ 51, 52).

Merriman testified that despite overseeing five to seven IRHs in the past two years, all of his previous determinations upheld United's decisions.  (JA 809:5-17).  Merriman also testified that he reviews whether the company's actions that have been taken by that particular moment were reasonable, not whether the employee has actually violated company policy. (JA 805:4-15).

### N.    The Union's Role at the Hearing and in the End of Sharif's Employment

Barbara Martin and Richard Pascarella were Sharif's union representatives at the IRH.  (Sharif Deposition, JA 212:2-9).  Pascarella was Chairman of the union's Grievance Committee.  (JA 627:16-21).  Immediately following the June 5, 2014 IRH hearing, Connor said United would fire Sharif, and Barbara Martin and Pascarella met with Kenneth Martin in Kenneth Martin's office to negotiate'. (JA 540:2-21). Barbara Martin, following her discussions with Kenneth Martin outside Sharif's presence, told Sharif that she thought he would be terminated and

23

recommended that he take retirement instead, so he could use his wife's travel benefit. (JA 541:11-,545:22). Sharif thought the union was pressing him to take retirement. (*Id.*, JA 543:4-18).

United's Answer admits that it told Sharif he would be fired on June 5, 2014. (JA 748 ¶ 112). United's Chairman, Jeff Smisek, issued Sharif a letter dated June 8, 2014, congratulating Sharif on his decision to retire. (JA 759). This was before Sharif had decided to retire. On June 9, 2014, Sharif emailed Barbara Martin stating "With greatest sadness and considerable loss of income I go with unconditional full retirement." (JA 761).

### O. **Kenneth Martin, the Union, and the Hearing Officer, All Make Jokes About the Situation**

After Sharif notified the union that he would take the option of retirement, Kenneth Martin, Barbara Martin, and Richard Pascarella engaged in a series of e-mails with mock complaints and with jokes about how quickly the union made this happen. (JA 812 to 813). When Barbara Martin wrote to Kenneth Martin that Sharif would confirm his intent to retire, Martin wrote back "make this snappy" and "About time Mrs. Martin." (JA 812). Pascarella then wrote to Martin "Was that snappy enough for your simple butt??" (JA 876). Martin responded "Nope…you guys are slow…xo[.]" (*Id.*).

No evidence in the record suggests that the union ever gave Sharif the option of challenging his termination through the grievance procedure. A reasonable jury

24

could infer from the jocular interactions between the union representatives and Kenneth Martin that Sharif was right in believing the union was trying to force him to take retirement.

Similarly, Merriman joked with Kenneth Martin regarding when he would be paid for the IRH, despite testifying that IRH officers are not paid for their time. (JA 873). A reasonable jury could infer from the jocularity of the exchange that Merriman would have ruled for United.

On June 10, 2014, Martin emailed Gracie Alexander regarding Sharif's separation report, stating that Sharif retired "In lieu of termination" and that Sharif "would have been terminated for FMLA abuse and pass travel violations." (JA 766 to 767).

### P.  <u>Martin Fired Another Employee for Using FMLA on a Workday Related to a Vacation</u>

In December 2013, LaTonya Love-Franks, a lead CSR (JA 308:17-19) requested FMLA for a workday in the midst of her vacation. (First Amended Complaint, JA 23 ¶ 122; Answer, JA 91 ¶ 122). Martin investigated Love-Franks's request (JA 310:16-19) and United terminated her employment. (*See* JA 302:1-17). Love-Franks pursued a grievance under the CBA and during the course of the grievance, the Union and United entered into a settlement agreement, reinstating Love Franks's employment. (*See id.* 307:14 to 308:16.) During

Martin's investigation of Love-Franks, he pulled her flight schedules.  (JA 605:21-22.)

### Q.    Absence of Evidence of Any Employee Terminations for a Single-Day Absence on Which FMLA Leave Was Not Requested

The record does not show any evidence that United ever terminated any employee for an absence on a single day, for any reason other than an FMLA-related reason.

## 2.    Statement of Proceedings

Sharif filed this action against United Airlines on September 30, 2014, for retaliation in violation of the FMLA and discrimination based on age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d) ("ADEA").

On November 10, 2014, United Filed a Motion to Dismiss Count II (Sharif's claim of age discrimination) of the Complaint and an Answer And Affirmative Defenses. Sharif amended his Complaint on November 19, 2014.  On November 25, 2014, United filed a Motion to Dismiss Count II (Sharif's claim of age discrimination) of Plaintiff's First Amended Complaint and a Supporting Memorandum. On January 6, 2015, the District Court issued an Order denying United's Motion.

On May 29, 2015, United filed a Motion for Summary Judgment on Sharif's FMLA and ADEA claims.  Sharif timely filed an Opposition, United filed a Reply,

and Sharif filed a Motion for Leave and Supporting Memorandum to Supplement his Opposition and filed an additional exhibit.

On June 19, 2015 the District Court heard oral argument regarding United's Motion. United requested permission to supplement the record with additional case law. The District Court granted United's request, permitting Sharif to file a response to United's supplemental brief.

On July 1, 2015, the District Court entered an Order granting summary judgment and dismissing Sharif's claims with prejudice. The District Court held that Sharif met the *prima facie* elements of an FMLA retaliation claim but failed to show that United's proffered legitimate, non-retaliatory reason for termination was pretextual. (JA 938). In determining that Sharif's termination was not pretextual, the District Court reasoned that "Even if United's investigation was not optimal, no reasonable fact-finder could conclude on this record that Sharif's supervisors' suspicions were not honestly held." (JA 937).

The District Court also held that Sharif had not put forth sufficient evidence to show his termination was due to age.

On July 2, 2015, Sharif timely filed a notice of appeal regarding the District Court's decision granting summary judgment. Sharif initially appealed the District Court's decision granting summary judgment on his ADEA claim but is no longer pursuing that issue.

27

## SUMMARY OF THE ARGUMENT

The lower court gave weight to evidence the jury would not be required to believe, weighed the evidence, made credibility determinations, and gave unwarranted deference to defense-favoring rubrics like the "honest belief," "business judgment," "investigations need not be optimal" and "courts are not super personnel departments" rubrics.  The result was that the lower court did not consider direct evidence of discrimination, and did not consider – or made excuses for – plaintiff's varied and substantial direct and indirect evidence of retaliation, and plaintiff's varied and substantial evidence that a jury could reasonably infer that United's asserted nondiscriminatory reason was simply a cover-up for retaliation.

## STANDARD OF REVIEW

The Circuit Court's review of a grant of summary judgment is de novo.

*Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).

## ARGUMENT

### A.     Proof of FMLA Retaliation Claims

To prevail on a FMLA retaliation claim, a plaintiff must either point to direct or indirect evidence of discrimination or proceed under the *McDonnell Douglas* burden-shifting framework. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under the latter method, a plaintiff must show "that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

### B.     Sharif Presented Direct Evidence of FMLA Retaliation

Sharif's termination is a direct result of Suzanne Hasser's March 31, 2014 e-mail to various United officials saying that Sharif had just called in FMLA for March 30, the only day he did not have covered during his vacation, and that "He did the same thing last September, 2013, just an FYI." (*Supra* at 15). Kenneth Martin testified that he began his investigation of Sharif because of this e-mail. (*Supra* at 14). He could not remember the date of the e-mail, but it was still stuck

29

in his mind that "he's done this before." (*Id.*). A reasonable jury could infer that Hasser's reference to Sharif's FMLA leave in September 2013 was a "but for" cause of Hasser sending the e-mail, starting an investigation, of Martin's irregular conduct of the investigation and failure to look for any information exonerating Sharif, of Martin's assumption that Sharif was lying after Martin had triggered a panic attack by blindsiding Sharif in his "investigative meeting," for Martin's recommendation that United fire Sharif, and for Connor's agreement with Martin's recommendation.

As shown at p. 23, *supra*, Martin never did anything to investigate whether there was any impropriety in Sharif taking FMLA leave in September 2013. There is no evidence in the record that Hasser or Connor or any other United official ever did anything to look into that question. A reasonable jury could infer that for Martin, Hasser, and Connor, it was unimportant to find out whether there was anything improper about Sharif's September 2013 use of FMLA leave because the mere taking of FMLA leave then was enough to cast suspicion on him and to justify taking action against him.

A reasonable jury could find that this was direct evidence that Hasser, Martin, and Connor were motivated by retaliation against Sharif for having taken protected FMLA leave in September 2013 when they took their various actions, and that this anti-FMLA animus was a "but for" cause of Sharif's termination.

30

There is further direct evidence of retaliatory animus.  United was required by its own promises and its collective bargaining agreement to pay Sharif until his IRH hearing.  Sharif found this out the day after the April 23, 2014 interview, and immediately called this to Martin's attention by e-mail, asking that the situation be corrected because he had financial obligations.  Sharif's pay stubs show that Martin failed to take any corrective action.[2]  A reasonable jury could infer that promising pay in accordance with an explicit promise and in accordance with the union contract, and then deliberately refusing to provide the promised pay, was a demonstration of Martin's retaliatory animus.

### C.   <u>Other Evidence Supports the Direct Evidence</u>

#### 1.   Departures from Normal Procedures and Standards

Other evidence supports this direct evidence.  As shown at pp. 15-16, *supra*, Martin and Connor failed to follow the mandatory procedures set forth in United's collective bargaining agreement.  The weak response of Sharif's union[3] neither explains nor excuses United's trampling on the rights to which those procedures entitled him.  It is black letter law that changes in policies or procedures can be evidence of discrimination.  *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977), stated:

---

[2] *Supra* at 21-22.
[3] *Supra* at 24-26.

> Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

*Accord*, *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000) (Jacobsen conceded that Russell was not given a formal oral warning, a written warning, or a 'corrective action plan,' all of which are required by Homecare's own internal procedures.").

In *Williams v. Hansen*, 326 F.3d 569, 587 (4th Cir. 2003), *cert. denied*, 540 U.S. 1089 (2003), this Court cited *Arlington Heights* and held that taking "a facially neutral administrative action … with an intent to discriminate against a particular racial group is forbidden by the Constitution."  The same principle applies to Hasser sending her e-mail, Martin seizing on it to start his "investigation," the conduct of the investigation and meeting with Sharif to reach a predetermined conclusion, and Martin's and Connor's agreement to fire Sharif.

### 2.    Comparator LaTonya Love-Franks

Circumstantial evidence, as in *Arlington Heights*, is available to buttress the direct evidence of retaliation as well as to show pretext.  Sharif showed that Martin had fired LaTonya Love-Franks, another employee who had called in FMLA leave on her vacation, and it took the union to get her job back. A reasonable jury could find that this was yet another instance of FMLA retaliation.

32

### 3. Evidence that United Did Not Care Much About Single-Day Absences, Except in the Context of FMLA

A reasonable jury could also infer from United's practice of simply giving a three-point penalty to employees who missed work and did not even call in ahead of time ("no call and no show"), and of simply giving a one-point penalty to an employee calling in sick,[4] that United did not regard missing work, with or without an excuse, as being significant enough to warrant dismissal unless the FMLA and a vacation were involved.

As pointed out above,[5] there is no evidence that United ever terminated any employee for an absence on a single day, for any reason other than an FMLA-related reason. A reasonable jury could also infer from the absence of such evidence that United's explanation of Sharif's termination was simply a cover-up for FMLA retaliation.

### 4. Martin's "Investigation" Was So Unbusinesslike, and So Far from a Common-Sense Inquiry, That it is Evidence of Animus and Pretext

Sharif also showed that Martin's purported "investigation" was so inadequate from the standpoint of any legitimate business purpose and, so unlike what any reasonable official would have done, that a reasonable jury could find it had nothing to do with Martin's finding out whether Sharif requested FMLA in

---

[4] *Supra* at 13-14.
[5] *Supra* at 21.

33

good faith or committed fraud, and was merely a Potemkin village intended only to provide a cover for firing an employee who had taken FMLA leave. See the fuller discussion of this topic *supra* at 16-20.

In *Wichmann v. Bd. of Trustees of Southern Ill. Univ.*, 180 F.3d 791 (7th Cir. 1999), defendant argued that it should have won as a matter of law due to the business-judgment argument, and that the trial judge erred in refusing to give a "business-judgment" instruction. The court stated that the defendant "is of course entitled to make business decisions, even bad ones, 'and it is not for this court to second-guess those decisions. But . . . the less sensible an employer's decision appears to be, the more likely it is that the jury will not credit it.'" *Id.* at 803 (ellipses in original).

Similarly, *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (*en banc*), held that the lower court had given "an unwarranted deference to the 'business judgment' defense. The lower court here similarly gave unwarranted deference to the "honest belief" argument. *Wexler* also collected the Circuit decisions up to that time holding that plaintiffs must be allowed to challenge the reasonableness of the employer's asserted nondiscriminatory reason as a means of showing that the employer did not really rely on that asserted reason. 317 F.3d at 577.

### D. This Circuit Allows a Combination of Direct and Indirect Evidence, as an Alternative to the *McDonnell Douglas* Approach

This Court has long held that plaintiffs may present a combination of "direct and indirect evidence "as an alternative to pretext analysis under *McDonnell Douglas*. *E.g.*, *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 577 (4th Cir. 2015) ("To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact."), citing *Rhoads v. F.D.I.C.*, 257 F.3d 373 (4th Cir. 2001), *cert. denied*, 535 U.S. 933 (2002) ("a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method."), and *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir. 1999).

The evidence of pretext discussed below meets the standard of "sufficient probative force" in addition to showing pretext.

### E. Sharif Established a *Prima Facie* Case Under the *McDonnell Douglas* Approach

United did not challenge the first element of the *prima facie* case, that Sharif's March 30, 2014 FMLA request constituted protected activity. (United's Memorandum in Support of Motion for Summary Judgment, JA 103-134). The lower court noted that United had conceded the issue, as the law of this Circuit requires. (July 1 Opinion, JA 928 n.2).

35

United did challenge the second element, that United subjected Sharif to an adverse action.  The lower court held that Sharif had shown a triable issue of fact on this element, (*id.*, JA 930-933), and stated: "Despite United's assertions, there is plenty of evidence supporting Sharif's claim that he was terminated."  (*Id.*, JA 932).

Lastly, United challenged the third, causation, element of the *prima facie* case.  The lower court also held that this element was met:

> … The investigation leading to this charge, however, resulted from Sharif's request for FMLA leave. … It is evident, then, that a causal connection exists between the two events, and thus the third prong of his prima facie case has been met.  United's argument is better suited to the pretext issue, and will be addressed below.

(*Id.*, JA 933).

## F.    The Grant of Summary Judgment Violated the Standards Set by the Supreme Court and this Court

In *Jacobs*, this Court held that the lower court there had violated many of the standards of Rule 56 when entering summary judgment for defendant.  So too, here.  *Jacobs,* drew attention to the Supreme Court's decision in *Tolan v. Cotton*, —— U.S. ——, 134 S. Ct. 1861, 1868 (2014) (*per curiam*) and to several types of errors made by the lower court there: weighing evidence, ignoring competent evidence contradicting the lower court's conclusions, drawing inferences on behalf of the movant, and resolving disputed issues in favor of the moving party.  780 F.3d at 569.

36

These are precisely the errors of the court below.  It ignored the undisputed evidence that United violated the union contract by denying him a consultation with the union before the meeting, it ignored Sharif's testimony that he was rattled and felt the beginnings of a panic attack because of Martin's blindsiding him, it assumed that Sharif's error in stating whether he had been scheduled to work on March 30 was deliberate deception, it held that Sharif "changed his story" when Sharif corrected his answer to indicate that he was in fact scheduled to work on March 30 and corrected Martin's misstatement that he said he was trying to travel on March 29, not March 30, it assumed there was no innocent explanation for the correction (such as trying to answer honestly), it ignored the evidence that Martin's entire investigation was no more than a Potemkin village intended to create a false "neutral record" so that an employee who took FMLA leave in 2013 as well as 2014 could be fired, it assumed on the basis of no evidence at all in the record that Sharif's September 2013 FMLA leave was fraudulent, and it weighed Martin's and Connor's credibility and found their investigation and its results were "honest."

### G.    The Lower Court Improperly Gave Weight to the Testimony of Interested Witnesses

Kenneth Martin and Jon Connor are highly interested witnesses. Their decisions are directly at stake in this litigation.  Their credibility at trial is subject to impeachment for the reasons stated herein.  The jury may or may not choose to believe them, but could reasonably look at the indirect evidence herein – the effort

to fire another United employee who called in FMLA leave while on her vacation,[6] the lack of importance United's own policies shows it gives to employee absences,[7] the result-oriented Keystone Kops nature of the "investigation" run by Martin,[8] Martin's and Connor's violation of the union contract and of company procedures to blindside Sharif by provoking a panic attack in the interview,[9] and Martin's and Connor's seizing on the results of the panic attack they created in order to reach their desired conclusion that Sharif was lying[10] – and, based on the evidence as a whole, reject their testimony.

In these circumstances, the Supreme Court has made clear that on a Rule 50 or Rule 56 motion, Martin's and Connor's testimony is to be considered *but is not to be given any weight*.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000), drew on 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 297-301 (2d ed.1995), stated:

> "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, *supra*, at 255, 106 S. Ct. 2505. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright & Miller 299. That is, the court

---

[6] *Supra* at 25.
[7] *Supra* at 12.
[8] *Supra* at 14,15,16,19.
[9] *Supra* at 17.
[10] *Supra* at 20.

38

should give credence to the evidence favoring the nonmovant as well
as that "evidence supporting the moving party that is uncontradicted
and unimpeached, at least to the extent that that evidence comes from
disinterested witnesses." *Id.*, at 300.

This Court reached the same result in *Edell & Associates, P.C. v. Law Offices of*

*Peter G. Angelos*, 264 F.3d 424, 436 (4th Cir. 2001) and in *Waste Management*

*Holdings, Inc. v. Gilmore*, 252 F.3d 316, 329 (4th Cir. 2001).

> ### H.   The Lower Court Improperly Invaded the Province of the Jury by Declaring Defendant's Officials Honest and Saying They Had an "Honest Belief"

> #### 1.   The Confused Underpinnings of the "Honest Belief" Rubric

Courts have sometimes used overly broad language that confuses rather than

clarifies basic legal contexts.  For example, it is clear that plaintiffs seeking to

prove pretext must prove that the employer's asserted nondiscriminatory reasons

are false, and that a reasonable jury may draw an inference of unlawful bias in the

challenged action.  It is equally true, however, that the decisionmaker's "honest

belief" – even where there is one – is not the end of the matter.  Decisionmakers

may be blind to their own biases, or may rely on biased information sent them by

others.  Honest beliefs may still be biased ones, or may still rely on biased input,

and the employer will still be liable.

Plaintiffs certainly accept the rule that evidence the defendant is lying about

the reasons for its action greatly aid plaintiffs in proving discrimination.  Plaintiffs

are not required to prove that a defendant is lying in order to prove pretext,

however.  In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993), the

Supreme Court stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required*," 970 F.2d, at 493 (emphasis added). …

(Footnote omitted.)  *Reeves* approved this formulation, 530 U.S. at 147, and

continued: "Proof that the defendant's explanation is unworthy of credence is

simply one form of circumstantial evidence that is probative of intentional

discrimination, and it may be quite persuasive."

The law is thus clear that proof of the employer's deceit as to its asserted

nondiscriminatory reason is a useful, but not a necessary, way to show

discrimination.  Plaintiffs must show that the employers' reasons are false, but

need not carry the additional burden of showing that the decisionmaker lied about

the reasons.

This case is a perfect example of this distinction.  Under the lower court's

rationale, any employer could shield itself from liability by assigning the duty of

investigation to a credulous official who had no idea what he or she was doing, but

who had an animus against the protected class and so did an "investigation" as

incomplete and one-sided as the investigation herein, one with a pre-ordained

40

result because the investigator sincerely believes that persons in the protected class are always poor or misbehaving employees. Plaintiffs in such cases should be able to prevail by showing that the defendants' reasons are false and that defendants should have known they were false, and should not also be saddled with the burden of proving that the incompetent "investigator" did not believe the facts his or her bias have predisposed him or her to believe.

Similarly, in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), the Court rejected the "honest belief" argument on which the lower court relied. In that USERRA[11] case, supervisors who were not decisionmakers made a false complaint about the plaintiff to the decisionmaker because they were upset about the plaintiff's military obligations. The decisionmaker conducted his own low-quality investigation, and decided to fire the plaintiff. He had no discriminatory intent, and honestly believed his own investigation and reasons for the termination. The Court held that the intent of the biased subordinates supplied the necessary intent under the statute, and that neither the decisionmaker's exercise of independent judgment nor his conduct of an independent investigation shielded the employer when an act of intentional bias by others is still one of the proximate causes of the decision. 562 U.S. at 420-21.

---

[11] Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301 *et seq.*

In this case, Hasser and Martin, two biased officials, began the proceeding to result in Sharif's firing, and Martin and Connor, two biased officials, made the decision to fire Sharif.[12]  Under *Staub*, the "honest belief" of biased officials cannot be made a defense to employer liability.  Where there is direct evidence, pretext analysis is inapplicable.  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("the *McDonnell Douglas* framework does not apply in every employment discrimination case").

## 2.     The Lower Court's Cases Actually Favor Sharif More than United

The lower court cited *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846 (4th Cir. 2001) as an example of a case where plaintiff showed that defendant's asserted belief was not honest.  (JA 934-935).  The lower court failed to take into account, however, that the EEOC's evidence was the unbusinesslike character of the defendant's inquiry into the facts, and the inconsistencies between the defendant's actions and assumptions and what a sensible employer would have done.  That is exactly what the lower court refused to do here, on the ground that it had to defer to United's judgment.

---

[12] *See supra* at 20-22.

The lower court relied on *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997), but that case differs radically from this. The question there was whether the decisionmaker who fired the plaintiff honestly believed that the plaintiff had punched another employee. Unlike this case, there were no departures from ordinary procedures, no harsher standards invented to penalize those asserting a statutory right, and clear evidence that the employer regarded punching other employees as a fireable offense. The defendant there showed that the decisionmaker knew of ten to twenty other incidents in which an employee had punched another employee, that each incident resulted in firing the employee who punched another employee, and that there were no contrary examples. 109 F.3d at 409 n.5. It was clear that the defendant regarded this as a major infraction. By contrast here, United has not shown that any single absence unrelated to the FMLA – even if it occurred in the middle of vacation days – had ever resulted in discharge. And, the evidence is that the only two employees Martin fired for a single absence had claimed FMLA leave in the middle of vacation days.[13] In the context of that case, it is unsurprising – but irrelevant to this case – that the court stated: "Giannopoulos cannot avoid summary judgment with an unadorned claim that a jury might not believe Brach's explanation for his

---

[13] *See supra* at 25.

43

termination; he must point to evidence suggesting that Brach itself did not honestly believe that explanation." 109 F.3d at 411.

The lower court also cited *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998), but the *dictum* in that decision also sheds little light on this case. The court there had no evidence of pretext except the evaluations of plaintiff's work by fellow employees who were not very familiar with it, who did not show that they knew the company's standards, and who attested to the fairness and honesty of the supervisor and that they had no reason to believe he would discriminate against plaintiff. *Id.* Here, by contrast, there is direct evidence of the anti-FMLA bias of United's decisionmakers, and a host of other evidence of pretext.

The lower court cited *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012), *Murphy v. Ohio State Univ.*, 549 Fed. Appx. 315, 322 (6th Cir. 2013), and *Smith v. Chrysler Corp.*, 155 F .3d 799, 806-07 (6th Cir. 1998). Each of these cases supports plaintiff's argument that the "honest belief" argument is not something a defendant can simply assert and get immunity, as here, but something that requires the belief to have been formed in an unbiased manner from a reasonable inquiry.

*Seeger*, for example, held that the employer must act on the basis of "a reasonably informed and considered decision … ." 681 F.3d at 285. Each of these

44

decisions held that a plaintiff can show the claimed belief to be a pretext for unlawful action.  In *Seeger*, the plaintiff did not even question the defendant's investigation.  *Id.* at 286.  *Seeger*, like the other decisions, also held that a plaintiff can show pretext by showing that the stated reason was not enough to motivate the employer to take the adverse action.  *Id.* at 285.

The lower court relied particularly on the unpublished – and therefore nonbinding[14] –decision in *Murphy* (July 1 decision, JA 935-937), but did not follow *Murphy*.  *Murphy* held:

> "[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." … The employer's decision-making process need not be optimal, or leave no stone unturned; "[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Id. If the employee proves the employer failed to do so, the employer's decision-making process is "unworthy of credence ... [and] any reliance placed by the employer in such a process cannot be said to be honestly held." ….

549 Fed. Appx. at 322 (citations omitted).  In *Murphy*, the claimed flaws were not substantive, as they are here: there was an unbiased gathering of the relevant facts, and the results were shared with the plaintiff, who was given an opportunity to comment.

---

[14] Sixth Circuit Local Rule 32.1(b).

*Moffat v. Wal-Mart Stores, Inc.*, — Fed. Appx. —, 2015 WL 4880135 (6th Cir. Aug. 17, 2015), applying these principles, held at *6:

> However, if the plaintiff can show that the employer's decisional process was "unworthy of credence" by producing "sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action," then the honest-belief defense does not apply.

By contrast, the lower court took the "not optimal" language of *Murphy* out of context and used it to disregard Sharif's evidence of a biased and irremediably botched investigation.

This is also a case in which a reasonable jury could conclude that there was nothing honest about Martin's beliefs. Hasser and he leapt to conclusions that Sharif must have committed fraud in September 2013 and rested everything upon it, but did nothing to find out if there was any truth to their assumption. If there is ever to be a place for the "honest belief" argument, it cannot be in a case in which there is no evidence whatsoever to support one of the essential pillars of that belief.

### 3.  A One-Day Absence Would Not Have Motivated United to Fire Sharif if He Had Not Asserted FMLA Rights

A reasonable jury could draw the inference that United attaches very little importance to employees not showing up for their assigned shifts.[15] On *this* record, the only one-day absences United really cares about, and will fire people for, are FMLA absences. A reasonable jury could conclude that United would not

---

[15] *Supra* at 12.

have considered Sharif's absence from work on March 30 a firing offense, and

therefore that United would not have regarded firing him for calling in FMLA

leave for that day, except to retaliate against him for taking FMLA leave.

Other courts have so held.  *E.g.*, *Rachells v. Cingular Wireless Employee*

*Services, LLC*, 732 F.3d 652, 668 (6th Cir. 2013) ("A plaintiff generally

demonstrates pretext by showing: '(1) that the proffered reasons had no basis in

fact, (2) that the proffered reasons did not actually motivate [the adverse

employment action], or (3) that they were insufficient to motivate [the adverse

employment action].'"); *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th

Cir. 2002) ("O'Neal may establish pretext with evidence that the defendants were

more likely than not motivated by a discriminatory reason or that their

explanations are not worthy of credence, i.e., they are factually baseless, did not

actually motivate the defendants, or were insufficient to motivate the adverse

employment action.").

### 4.    Badly-Flawed Investigations Are Evidence of Pretext, and Martin's Investigation was Badly Flawed

The lower court believed that all the deficiencies in Martin's "investigation"

could be washed away by two of United's talismanic incantations:

(a) investigations need not be perfect, and (b) Martin honestly believed the results

of his flawed "investigation."  (July 1 Opinion, JA 934-936).  The lower court

recognized that some plaintiffs may be able to show that the employer's belief was

not honest, *id.*, but held that none of Sharif's evidence drew United's honesty into

question.  (*Id.*, JA 935-937).

In addition to *Wichmann* and *Wexler* and the other Sixth Circuit cases

discussed above, *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 29 (1st

Cir. 2015), is close to being on all fours with this case.  Like United, Villa Cofresi

relied on the "honest belief" argument, based on the notion that the plaintiff had

committed misconduct.  Soto-Feliciano and Sharif both relied in part on a lack of

evidence in the record, and that should have been in the record if defendants'

asserted nondiscriminatory reasons were not mere pretexts for unlawful motives.

Unlike the lower court's dismissive approach here, the First Circuit looked at the

substance of what was missing and why defendant's explanation might be rejected

by a reasonable jury:

> To challenge the defendants' contention that Soto's misconduct
> motivated the adverse employment action, Soto relies chiefly on what
> the record does not show. But to understand why the holes Soto
> highlights in the defendants' account might matter, we first need to
> lay out the case for the defendants' contention that the decision to fire
> Soto had nothing to do with his age and instead resulted entirely from
> his misconduct. We will then be in a position to evaluate Soto's
> contention that the record reveals potentially significant gaps and
> inconsistencies in the defendants' proof on that point—gaps and
> inconsistencies, Soto contends, that would permit a rational jury to
> find that the defendants' claimed misconduct-based reason for firing
> him is in fact a pretext.

779 F.3d at 29.  Unlike the case at bar, the First Circuit examined the evidence in

light of this standard, and found that the inconsistencies in the employer's

48

explanation drew its honesty into question. "On this record, we believe Soto has shown inconsistencies in the defendants' case sufficient to support an inference of pretext." *Id.* If the lower court had followed the First Circuit's approach, this appeal would have been unnecessary and the case would have been tried and resolved by now.

Martin's so-called "investigation" never sought any information from which the truth of Sharif's *bona fides* could be obtained. He sought airline schedules, but any reasonable jury would know that airline schedules only tell one which flights are supposed to occur at which times from which airports, and that they can never tell one which flights were full, or were not even accepting full-fare standby travelers. Martin sought United's reservation information, but the only evidence of record on the subject is that United does not fly to or from Cape Town[16] and any reasonable jury would know that one cannot find out anything as to the difficulty in getting out of Cape Town from looking at the reservations of an airline that does not fly there. He sought to find out from where Sharif's phone call to the Employee Resource Center had originated or been routed, but there is no record evidence stating that this made any difference. Martin had been through all this before, with LaTonya Love Franks. A reasonable jury could have inferred that a

---

[16] This is an indirect inference from Sharif's testimony. (JA 505:3-9 and JA 509:3-6).

repeated "plan of action" pretty much guaranteed to be fruitless was simply a cover-up to conceal FMLA retaliation.

Martin admitted he does not even know how to read the information in United's reservation system and could make no sense out of it. He also admitted that he had done the same earlier, when he was "investigating" a different lead customer service representative who had called in on FMLA leave while on vacation. It is therefore undisputed that when Martin obtained the information in United's reservation system to "investigate" Sharif, *he already knew it was useless*. But, it did show activity.

United did not present any evidence that Martin sought the assistance of someone knowledgeable so that he could understand the United reservation information. A reasonable jury could infer that Martin never intended to find out anything from the United reservation system, any more than a man who does not know how to read intends to gather information from a book, and that the entire activity was just a show to conceal retaliation for taking FMLA leave.

United's reservation information might have disclosed whether there was disruption in travel to and from Europe and/or Africa starting after March 26, when the three-day strike of Lufthansa, a large airline, was announced. The jury would have been entitled to apply its own understanding of how likely it is that a strike at a major airline could widely perturb travel plans, since this is part of a jury's

common experience. *United States v. Ashley*, 606 F.3d 135, 140 (4th Cir. 2010),

*cert. denied*, 562 U.S. 987 (2010), stated:

> Our system of lay juries is designed to allow jurors to draw upon
> common experience and to rely upon reasonable intuitions, and it is
> not the province of an appellate court to undermine these virtues by
> picking apart a properly instructed verdict. "[W]hile it is important
> that we not permit a verdict based solely on the piling of inference
> upon inference, it is also imperative that we not rend the fabric of
> evidence and examine each shred in isolation."

Since Martin never looked at United's reservation information for the answer to

that question, a reasonable jury could infer that Martin's investigation was always

and only a pretext to provide a cover for retaliation.

A reasonable jury could also infer that any good-faith investigation or

recommendation by Martin and any good-faith decision by Connor would have had

to include asking Sharif's direct supervisor, Trainum, whether she thought Sharif

was lying in the April 23 meeting. She thought he was telling the truth. Neither

Martin nor Connor asked her, and a jury could reasonably infer they had made up

their minds before the April 23 meeting, and that that meeting was only a formality

to provide an excuse for their retaliation.

There is no evidence in the record that Martin took any action that would

have been likely to shed light on Sharif's *bona fides*, the ostensible point of his

investigation. As one of the largest airlines on the planet, a jury could reasonably

infer that Martin had at his fingertips, in-house within the company, information

about changes on load factors on United flights after the announcement of the

Lufthansa strike, and airline and travel industry information on the sold-out status

of airlines leaving Cape Town on March 28 and 29, 2014.  A jury could reasonably

infer that anyone conducting any business-related investigation would have simply

called up the airlines operating out of Cape Town the preceding month, and find

out what the conditions were. Martin's own interview notes show that on April 23

he was well aware of Sharif's unchanging explanation.  Yet he and Connor did

nothing after the April 23 meeting except decide internally that Sharif was a liar,

cooperate in firing him, and as to Martin, cheating Sharif out of his pay until the

investigative hearing was held.

A reasonable jury could infer that the "investigation" was so thoroughly

unbusinesslike that it was a cover-up for retaliation.  A reasonable jury can also

infer pretext from the unreasonableness of the defendants' actions. *Rachells*, 732

F.3d at 668; *Radentz v. Marion County*, 640 F.3d 754, 758-59 (7th Cir. 2011).

Martin admitted that he never looked at the information Sharif had provided

to United to substantiate his entitlement to FMLA leave for panic attacks and never

asked for recertification to see whether Sharif was in fact still subject to such

attacks.  A reasonable jury could infer that the omission of such an obvious and

fundamental step meant that the "investigation" was entirely for show, to conceal

FMLA retaliation.

*United has been caught doing this before. Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001), stated:

> From the evidence at trial, the jury could have concluded that the IRT investigation into Sporer's conduct was a sham designed to discredit Mr. Bruso and to protect the managers who should have taken action to correct Sporer's harassment sooner. If the jury accepted this evidence, which its verdict in Mr. Bruso's favor suggests it might have, then it could have concluded that United did not make a good faith effort to comply with Title VII despite its formal antidiscrimination policy.

Further, in *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 445-46 (4th Cir. 2000), this Court held that a combination of direct, indirect and circumstantial evidence of animus, burying information, and intimidating employees, "a reasonable juror could infer that the system was implemented in an effort to mask such a corporate policy" of keeping African-American employees in low-level positions. And, last month, the D.C. Circuit also addressed the question whether some investigations are so obviously deficient as to be bogus. *Burley v. National Passenger Rail Corp.*, — F.3d —, 2015 WL 5474078 (D.C. Cir. Sept. 18, 2015), stated at *4,

> An employer's investigation that is so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination can also permit a factfinder to find pretext.

**5.    The Irregularity of Martin's Proceedings Are Evidence of Retaliatory Animus and Pretext**

Martin's irregular proceedings – blindsiding Sharif, violating Sharif's rights under the union contract, misstating Sharif's answers and blaming Sharif for Martin's own misstatements, and provoking a panic attack whose symptom of great nervousness was apparent to Sharif's supervisors, and is even revealed in Martin's own notes – were dismissed by the lower court as merely "not optimal." A reasonable jury could infer, however, that the irregular proceedings were intended to provoke a panic attack that would then give Martin and Connor cover for firing Sharif for having used FMLA leave on vacation, and that Sharif and Connor did not care in the slightest whether Sharif was telling the truth.

A reasonable jury could infer, from Martin's breach of his promise that Sharif would be paid his regular pay from the April 23 meeting until the investigative hearing, from Martin's breach of the union contract requiring that Martin remain on paid status, and from Martin's breach of Connor's understanding, that Martin has a deep-seated animus against employees taking FMLA leave, and that this same animus tainted his "investigation."

**I.    The Lower Court Gave Unwarranted Deference to United's Claim of an "Honest Belief"**

The lower court held that none of Sharif's evidence mattered, or found explanations or theories under which Sharif's evidence would not matter, because

all United needed to do was to show an honest belief. This was fundamentally erroneous. If accepted, it would hand every defendant immunity from the employment discrimination laws by allowing it to conduct an investigation that simply stirred the air and ignored the real issues, and then incant the "honest belief" talisman. *First*, under *Reeves* and the Fourth Circuit case law set forth above, the lower court could not place any weight on the disputed testimony of Martin and Connor because a jury would not be required to credit them instead of crediting all of the evidence the lower court dismissed. Without Martin's and Connor's testimony of their subjective state of mind that they concluded Sharif was lying, there is no other evidence to support an honest belief.

*Second*, under *Jacobs* and a host of similar cases going back to the original promulgation of Rule 56, the lower court is not supposed to weigh evidence and determine credibility. Still less is it supposed to dismiss a vast array of evidence that the "investigation" was tainted by retaliation, by saying it does not matter if an investigation is "not optimal." Nor is it supposed to accept anything it imagines might be a nondiscriminatory reason. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005), a jury discrimination case relying in part on *Reeves*, stated:

> But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that

55

might not have been shown up as false. The Court of Appeals's and the dissent's substitution of a reason for eliminating Warren does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions.

*Third*, the lower court made the fundamental error of disaggregating the evidence and examining isolated parts of the evidence out of their context with the others. *United States v. Arvizu*, 534 U.S. 266 (2002), a Fourth Amendment case, rejected the approach of segmenting evidence when a determination is supposed to be made in light of all the evidence. In *Arvizu*, the Court held that the Ninth Circuit had considered in isolation each circumstance that led to the stop, and rejected it if the lower court could conceive of a possible innocent explanation. *Id.* at 274-75. But that is just what the lower court did here.

*Fourth*, as applied by the lower court, the "honest belief" argument would destroy the effectiveness of the antidiscrimination and antiretaliation laws. As with other defense arguments like the "independent investigation" arguments, it leaves no room for the statute to be enforced. *Staub v. Proctor Hospital*, 562 U.S. 411, 421 (2011), rejected the argument:

> We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault." The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.

And here, a reasonable jury could infer that Hasser and Martin had an original animus to Sharif's FMLA rights, which caused the investigation. Unlike Staub, however, there was no decisionmaker innocent of an anti-FMLA animus. A reasonable jury could infer that both Martin and Connor participated in a bogus course of action intended to result in firing a 24-year employee just months before he would have become eligible for lifetime benefits.

For purposes of this case, the Court need not address the "honest belief" argument in its entirety; it is enough here to say that such an argument has no place in a case where there is so much direct, indirect, and circumstantial evidence of anti-FMLA animus and evidence of pretext. Indeed, if the lower court's approach had been good law, the Supreme Court in *Arlington Heights*, *Reeves*, and most other landmark civil rights decisions would have found for defendants, saying plaintiffs had only proved that defendants' actions were "not optimal" and that plaintiffs could not disprove the perpetrator-proclaimed honesty and sincerity of his or her beliefs.

The Fourth Circuit has held that "where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Jacobs*, 780 F.3d at 568-69. That is abundantly true as to Martin's claim of reliance on his "investigation"

and his and Connor's professed reliance on "honest belief." A jury should make this determination, not the district court on summary judgment.

## CONCLUSION

For the foregoing reasons, Appellant Masoud Sharif respectfully requests that the decision of the District Court granting United's Motion for Summary Judgment be REVERSED and that the case be REMANDED for trial.

Respectfully submitted,

/s/ R. Scott Oswald
R. Scott Oswald
VA Bar No. 41770
Andrea M. Downing
VA Bar No. 79584
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2883
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
adowning@employmentlawgroup.com

Richard Talbot Seymour
Law Office of Richard T. Seymour, P.L.L.C.
Suite 900, Brawner Building
888 17th Street, N.W.
Washington, DC 20006-3307
(202) 785-2145
(800) 805-1065 (facsimile)
rick@rickseymourlaw.net

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,675*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>October 19, 2015</u>            <u>/s/ R. Scott Oswald          </u>
                                                            *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 19th day of October, 2015, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> Angela H. France
> Hugh S. Johnson, Jr.
> PCT LAW GROUP, PLLC
> 330 John Carlyle Street, Suite 300
> Alexandria, Virginia  22314
> (703) 881-9141
>
> *Counsel for Appellee*

I further certify that I caused the required copies of the Brief of Appellant

and Joint Appendix to be hand filed with the Clerk of the Court.

> /s/ R. Scott Oswald
> *Counsel for Appellant*