RECORD NO. 15-1747

# United States Court Of Appeals

*for the*

# Fourth Circuit

**MASOUD SHARIF,**

*Appellant*,

**- v. -**

**UNITED AIRLINES, INC.,**

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

## BRIEF OF APPELLEE

H. Scott Johnson, Jr.
Angela H. France
PCT LAW GROUP, PLLC
330 John Carlyle Street, Third Floor
Alexandria, Virginia 22314
(703) 881-9141

*Counsel for Appellee United Airlines, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Rule 26.1, Appellant United Airlines, Inc. ("United"), by and through its undersigned counsel, states that it is a wholly-owned subsidiary of United Continental Holdings, Inc. (a Delaware Corporation), which is a publicly held company. To United's knowledge, no other publicly-held company beneficially owns 10 percent or more of the outstanding common stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ...............................................................iv

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................1

STATEMENT OF THE CASE................................................................1

STATEMENT OF FACTS ..................................................................3

SUMMARY OF ARGUMENT ..........................................................21

ARGUMENT ....................................................................................23

I.      STANDARD OF REVIEW .....................................................23

II.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT SHARIF FAILED TO PRESENT SUFFICIENT DIRECT EVIDENCE TO PROCEED WITH HIS FMLA CLAIM.........................24

        A.      Sharif has Waived his Direct Evidence and Indirect Evidence Arguments ...............................................25

        B.      Sharif Has Waived his Mixed-Motive Argument ............................27

        C.      Sharif Failed To Establish That United Was Motivated By A Retaliatory Animus.................................................28

III.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT SHARIF FAILED TO ESTABLISH HIS FMLA RETALIATION CLAIM UNDER THE *MCDONNELL DOUGLAS* FRAMEWORK .......30

        A.      Sharif Has Failed to Establish a *Prima Facie* Case for FMLA Retaliation ..............................................31

B.    United Proffered a Legitimate, Non-Retaliatory Reason for Proposing Sharif's Termination ........................................................32

C.    Sharif Failed to Establish That United's Legitimate, Non-Retaliatory Reason for Proposing His Termination Was Pretextual ............................................................................................33

1.    Sharif has not Presented any Legitimate Comparator Evidence ..............................................................................41

2.    Sharif has not Presented Any Evidence To Rebut United's Legitimate, Non-Retaliatory Reason for Proposing His Termination .................................................44

3.    United's One Day Absence Policy is Irrelevant ..................46

4.    The District Court Properly Adhered to Rule 56 Standards .............................................................................47

IV.   THE  UNSUPPORTED  STATEMENTS  IN  SHARIF'S STATEMENTS OF FACTS MUST BE DISREGARDED ......................49

CONCLUSION ....................................................................................................52

STATEMENT REGARDING ORAL ARGUMENT .........................................53

CERTIFICATE OF COMPLIANCE..................................................................54

iii

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................... 24, 52

*Cline v. Roadway Exp., Inc.*,
  689 F.2d 481 (4th Cir. 1982) ...............................................26

*Covenant Media of South Carolina, LLC v. City of North Charleston*,
  493 F.3d 421 (4th Cir. 2007) ................................................23

*Darvishian v. Geren*,
  404 F. App'x 822 (4th Cir. 2010) ........................................36

*DeJarnette v. Corning Inc.*,
  133 F.3d 292 (4th Cir.1998) .................................................37

*Estate of Weeks v. Advance Stores Co.*,
  99 F. App'x 470 (4th Cir. 2004) ..........................................27

*Foster v. Univ. of Maryland-E. Shore*,
  787 F.3d 243 (4th Cir. 2015) ................................... 25, 26, 30

*Francis v. Booz, Allen & Hamilton, Inc.*,
  452 F.3d 299 (4th Cir. 2006) ...............................................24

*Giannopoulos v. Brach & Brock Confections, Inc.*,
  109 F.3d 406 (7th Cir.1997) ........................................... 37, 49

*Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*,
  64 F.3d 962 (4th Cir. 1995) ..................................................25

*Holland v. Wash. Homes, Inc.*,
  487 F.3d 208 (4th Cir. 2007) ........................................ 34, 35, 41

iv

*Honor v. Booz-Allen & Hamilton, Inc.*,
  383 F.3d 180 (4th Cir. 2004) ...............................................................23

*Laing v. Fed. Exp. Corp.*,
  703 F.3d 713 (4th Cir. 2013) ............................... 26, 44, 47, 48

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)...........................................................................25

*Mitchell v. Toledo Hosp.*,
  964 F.2d 577 (6th Cir. 1992) ...............................................................44

*Murphy v. Ohio State Univ.*,
  549 F. App'x 315 (6th Cir. 1998) .......................................................50

*Othentec Ltd. v. Phelan*,
  526 F.3d 135 (4th Cir. 2008) ...............................................................24

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)...........................................................................35

*Seeger v. Cincinnati Bell Tel. Co.*,
  681 F.3d 274 (6th Cir. 2012) ...............................................................50

*Smith v. Chrysler Corp.*,
  155 F.3d 799 (6th Cir. 1998) ....................................................... 38, 43

*Smith v. Stratus Computer, Inc.*,
  40 F.3d 11 (1st Cir.1994)...................................................................44

*St. Mary's Honor Ctr. V. Hicks*,
  509 U.S. 502 (1993)...........................................................................35

*The Dartmouth Review v. Dartmouth College*,
  889 F.2d 13 (1st Cir. 1989)...............................................................44

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  133 S. Ct. 2517 (2013)........................................................................29

*Yashenko v. Harrah's NC Casino Co., LLC*,
   446 F.3d 541 (4th Cir. 2006) ...................................................................32

## **Rules**

Fed. R. Civ. Proc. 56 ...........................................................................2, 47

Fed. R. App. Proc. 28(a) ..........................................................................54

## JURISDICTIONAL STATEMENT

Appellant Masoud Sharif's ("Sharif") jurisdictional statement is complete and accurate.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the United States District Court for the Eastern District of Virginia, Alexandria Division (the "District Court") correctly granted summary judgment in favor of Appellee United Airlines, Inc. ("United") on Appellant Masoud Sharif's Family and Medical Leave Act ("FMLA") retaliation claim.

## STATEMENT OF THE CASE

This appeal emanates from United's proposed termination of Sharif's employment for violating the company's honesty policy in its Working Together Guidelines, and Sharif's contention that United acted in retaliation for his use of FMLA leave.

On March 30, 2014, Sharif used FMLA leave to excuse the only day on which he was scheduled to work during a 20-day vacation with his wife to South Africa and Italy. Suspecting that Sharif's use of FMLA leave may be fraudulent, United conducted an extensive investigation into Sharif's March 30th absence. United concluded from its investigation that Sharif had violated the company's

1

honesty policy by fraudulently claiming an FMLA qualifying illness as the reason for missing his scheduled work shift and by failing to be truthful during the company's investigation. As a result, United proposed Sharif's termination pursuant to the process set forth in its collective bargaining agreement with Sharif's union, which mandated an impartial hearing before a hearing officer.

Prior to a decision from the hearing officer on whether he would uphold United's proposed termination, Sharif voluntarily retired from his employment and subsequently commenced an action against United in the District Court. In his Amended Complaint, Sharif alleged that United retaliated against him in violation of the FMLA, and that United discriminated against him in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). United moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

On July 1, 2015, the District Court granted United's Motion for Summary Judgment and dismissed Sharif's Amended Complaint in its entirety. The District Court concluded that dismissal of Sharif's FMLA retaliation claim was warranted because he failed to present any direct evidence of retaliation. Additionally, the District Court further held that dismissal of Sharif's FMLA claim was appropriate because he failed to establish that United's proffered legitimate, non-retaliatory reason for proposing his termination was pretextual as no reasonable fact-finder could conclude that United's suspicions were not honestly held.

2

On this appeal, Sharif challenges the District Court's dismissal of his FMLA retaliation claim, but concedes that the District Court properly granted summary judgment in United's favor on his ADEA claim.

## STATEMENT OF FACTS[1]

### A.   Sharif's Employment History with United

In 1990, Sharif started working for United as a customer service representative ("CSR") in Sterling, Virginia. (JA 139, RFA No. 4; *see* JA 15 at ¶ 32.) In or about 2004, Sharif transferred to United's facility at Washington Dulles International Airport ("Dulles") in Dulles, Virginia, where he continued his employment as a CSR, but with the title of Service Director, until his voluntary retirement in June 2014. (*See* JA 15 at ¶ 33.)

In 2012, Sharif's wife, Fereshteh Sharif, commenced working for United as a CSR at the company's Dulles facility. (*See* Masoud Sharif's Deposition Transcript ("Sharif Dep."), JA 176:2 – 13.)

---

[1]  Sharif's Statement of Facts not only contains argument unsupported by facts, but also contains "factual" statements which are inaccurate and misleading and/or which have absolutely no support in the record. United has further addressed this issue below in Section IV of this Brief.

3

**B.    United's Customer Service Representative Position**

United's CSRs are members of the International Association of Machinists and Aerospace Workers (the "Union"). (JA 239.) As members of the Union, the terms of each CSR's employment is governed, in part, by a collective bargaining agreement ("CBA") between the Union and United. (Sharif Dep., JA 165:17 – 166:4.) *Inter alia*, the CBA sets forth various expectations, rights, and obligations with respect to job classifications, compensation, benefits, investigations, and grievances for CSRs and other passenger service employees. (JA 238.)

CSRs are further subject to United's Working Together Guidelines (the "Guidelines"). (JA 261 – 266.) The Guidelines, which are available through United's internal website, are a series of policies that set performance and conduct expectations for United's employees. (*Id.*) Among the policies set forth in the Guidelines is United's honest policy ("Honesty Policy"), which, in part, requires employees to "[b]e truthful in all communications, whether oral, written or electronic." (JA 264.)

As Sharif was classified as a CSR, the terms of his employment were subject to the CBA and the Guidelines. (*See* JA 238; JA 261 – 266.)

**C.    Sharif's Intermittent FMLA Leave**

In 2009, Sharif was diagnosed with anxiety. (JA 16 at ¶ 45.) In furtherance of managing his anxiety, Sharif submitted a request to United's Employee Service

4

Center for unpaid intermittent leave under the FMLA. (JA 16 at ¶ 46.) On June 22, 2009, United approved Sharif's request for FMLA leave for a 12-month period and authorized Sharif to take intermittent FMLA leave 1-2 times per month for a duration of 1-7 days per episode. (JA 551.)

As United required its employees to submit requests for intermittent FMLA leave on an annual basis, Sharif submitted requests in 2010, 2011, 2012, and 2013. (*See* JA 17 at ¶ 50.) United approved each of Sharif's requests for unpaid intermittent FMLA leave, with its last approval covering the period from June 8, 2013 through June 8, 2014 and providing Sharif with intermittent approval to take FMLA leave up to one time per month for a duration of 1-5 days. (JA 267.) As was the case with each of its previous approvals, United's approval of Sharif's 2013 request for intermittent FMLA leave was based on Sharif's "serious health condition meet[ing] the criteria specified by the [FMLA] and/or Company policy." (*Id.*)

Sharif frequently used FMLA leave. (JA 17 at ¶ 51.) Indeed, from August 2011 until his resignation in June 2014, Sharif took FMLA leave on 56 occasions. (*See* JA 283 – JA 284.[2]) Typically, Sharif would take FMLA leave 3-4 days in a

---

[2]   The "FMLN" and "FMNP" designations on Sharif's work calendar represent days on which Sharif took FMLA leave. (JA 142, RFA Nos. 14 – 18.)

row; often sandwiched in between, or used in conjunction with, weekends, holidays, requested days off, and his regularly scheduled days off. (*Id.*)

Up until his use of FMLA leave on March 30th, United never once questioned Sharif about his attendance or his use of intermittent FMLA leave. (*See* JA 17 at ¶ 51.)

### D. Sharif and His Wife Take An Extended Vacation to South Africa and Italy

Sharif and his wife planned a vacation to Cape Town, South Africa that was scheduled to depart in March 2014. (JA 18 at ¶¶ 62, 64.) In preparation for their trip, Sharif and his wife each sought to arrange their work schedules in order to accommodate their extensive vacation plans. (JA 18 at ¶ 66; *see* JA 283 – JA 284; Undisputed Facts, *see* JA 113 – 114 at ¶¶ 14 – 15; JA 410.)

Sharif bid for, and was awarded, vacation leave for March 16-17, 19-20, 23-24, and 26-27 and United approved his request for personal holiday leave on April 2-3. (JA 283 – 284.) As Sharif's regular days off were scheduled for March 18, 21-22, 25, 28-29, April 1, and 4-5, he was able to clear his work schedule from March 16, 2014 through April 6, 2014, with the exception of shifts that he was scheduled to work on March 30th and 31st. (*Id.*; JA 144, RFA No. 19) Similarly, Sharif's wife arranged her schedule so that she was off of work from March 16, 2014 through April 4, 2014. (Undisputed Facts, *see* JA 113 – 114 at ¶¶ 14 – 15; JA 410.)

On March 13, 2014, just two days prior to his scheduled vacation departure date, Sharif advertised the availability of his March 30th and 31st work shifts on SkedFlex, an automated software platform that United employees utilize for trading or picking up work shifts. (SA 1 – SA 10;[3] JA 144, RFA Nos. 21 – 22.) Although Sharif was able to obtain coverage for his March 31st shift, he was unable to find anyone to cover his March 30th shift. (JA 144 – 146; RFA Nos. 23 – 25.) If not for Sharif's work obligations on March 30th, Sharif and his wife would have had 20 continuous days off of work for their vacation to South Africa and Italy. (*See* JA 283 – 284; Undisputed Facts, *see* JA 113 – 114 at ¶¶ 14 – 15; JA 410.)

On March 15, 2014, Sharif and his wife departed for South Africa, via one-way discounted standby airline tickets secured under United's pass travel policy for employees. (JA 18 at ¶¶ 63 – 64.) Upon their arrival in Johannesburg, South Africa, they were joined on their vacation by three of Sharif's relatives who had traveled from Iran. (*See* Sharif Dep., JA 175:17 – 176:1.)

On March 26, 2014, Sharif and his family left Johannesburg and continued their vacation in Cape Town, where Sharif's relatives secured a large, multiple bedroom rental house from March 26th through March 30th. (*Id.,* JA 178:20 – 179:5, 181:9 – 17.) Their visit to Cape Town coincided with the renowned Cape

---

[3]   Citations to the Supplemental Appendix are prefixed with "SA" followed by the applicable page number, such that citations appear in the form of "SA ___".

Town International Jazz Festival, an annual four-day festival that is commonly referred to as "Africa's Grandest Gathering" and hosts over 37,000 attendees. (JA 18 – 19 at ¶¶ 70 – 72.)

### E. While on Vacation, Sharif Calls Out of His Scheduled Shift for FMLA Leave

Although Sharif was scheduled to work from 12:30 p.m. – 11:00 p.m. on March 30th, Sharif and his wife did not make any reservations for a return flight. (*See* JA 18 at ¶¶ 64-65.) Instead, Sharif and his wife planned to book standby tickets at the airport on the day of their intended return to Washington, D.C. (*Id.*) *Purportedly*, Sharif and his wife went to the Cape Town airport on the morning of March 28th with the hope of booking standby tickets for their return flight home. (*Id.* ¶ 73.) However, Sharif and his wife were *allegedly* unable to book a return flight on March 28th because all of the potential flights were sold out due to the jazz festival.[4] (*Id.* at ¶¶ 73 – 77.)

Sharif and his wife *allegedly* spent the night of March 28th at the airport and continued their search for a return flight on March 29th. (*Id.* at ¶ 78.) The last flight that Sharif and his wife could have taken that would have allowed Sharif to report on time for his March 30th work shift departed Cape Town at 7:00 p.m. (UTC)/1:00

---

[4]   Although Sharif was supposedly unable to book a return flight to Washington, DC from Cape Town on March 28th because of the jazz festival, Sharif admits that the jazz festival had not yet concluded on March 28th. (JA 146, RFA No. 27.)

p.m. (EST) on March 29th. (Sharif Dep., JA 188:15 – 189:16; *see* JA 291 at ¶¶ 49 –

51.) However, Sharif and his wife were *allegedly* unable to get seats on this flight.

(JA 291 at ¶¶ 49 – 51.)

Because he was unable to book a flight out of Cape Town, Sharif *allegedly*

suffered "a full-on anxiety attack" on March 30th at 7:00 a.m. (UTC)/1:00 a.m.

(EST).[5] (JA 19 at ¶ 79.) Despite knowing, as of 7:00 p.m. (UTC)/1:00 p.m. (EST)

on March 29th, that there was no way that he could make it back in time for his

March 30th work shift, Sharif waited until 7:00 a.m. (UTC)/1:00 a.m. (EST) on

March 30th to call United's Employee Service Center to inform United that he was

going to take FMLA leave for that day because he was ill.[6] (Sharif Dep., JA 194:1

– 17; *see* JA 20 at ¶ 83.)

On the evening of March 31st, Sharif and his wife flew from Cape Town to

Dubai and then flew from Dubai to Milan, Italy on April 1st, where they visited

with Sharif's niece for two days. (JA 146 – JA 147, RFA Nos. 28 and 29; Sharif

---

[5]   Sharif alleges that he was "incapacitated and unable to fly" because of the panic
attack situation that he suffered on March 30th. (JA 19 at ¶ 82.) However, even if
Sharif was able to obtain a flight from Cape Town at the time that he suffered the
"full-on anxiety attack," he still would not have made it back to Washington, D.C.
in sufficient time to make his March 30th work shift. (Sharif Dep., JA 195:15 –
196:21.)

[6]   By waiting until 1:00 a.m. (EST) to call out for FMLA leave, Sharif was able to
simply leave a message instead of having to talk to a "live" person. (Sharif Dep.,
JA 195:4 – 8.)

Dep., JA 525:10 – 11.) Sharif and his wife returned to Washington, D.C. on April 3, 2014. (JA 20 at ¶ 89.)

### F.     United's Investigation of Sharif's March 30th Absence

On March 31, 2014, Suzanne Hasser, a Senior Coordinator in United's Dulles Employee Service Center, noticed that Sharif had called out sick and taken FMLA leave on March 30th, which was the only day that he didn't have covered for his vacation out of the country.[7] (JA 296.) She also noticed that Sharif's calendar coordinated with his wife's calendar and that Sharif and his wife had coordinated their schedules in similar fashion in September 2013. (*Id.*) Hasser reported her observations to Ken Martin, the head of human resources for United at Dulles. (*Id.*; Martin Dep., JA 312:13 – 16.)

Upon receiving Hasser's email, Martin proceeded to conduct an investigation in furtherance of garnering a better understanding of Sharif's March 30th absence. (Martin Dep., JA 314:17 – 19.) As he had done in similar previous investigations, Martin pulled Sharif's employee calendar and his wife's employee calendar. (*Id.*, JA 315:2 – 5.) Additionally, Martin pulled various information from United's reservation system to try and understand what flights the Sharifs booked;

---

[7]  As a Senior Coordinator in United's Employee Service Center at Dulles, Hasser's responsibilities included "staffing of overtime, staffing of people during the day… coordinat[ing] the functions of calling for overtime; things that have to with manpower." (Kenneth Martin's Deposition Transcript ("Martin Dep."), JA 313:13 – 314:5.)

when they made their reservations; and, their flight schedules. (*Id.*, JA 315:7 – 17.) Furthermore, Martin asked corporate security to investigate United's Employee Service Center's phone log to see if they could determine the telephone number from which Sharif called on March 30th to take FMLA leave. (*Id.*, JA 315:18 – 22.) Martin also discussed the investigation with Jon Connor, United's Area Manager at Dulles Airport. (*Id.*, JA 608:20 – 609:13.) They talked about finding a time to sit down with Sharif. (*Id.*, JA 609:1 – 4.) Martin testified that it was important to "get [Sharif's] side of the story," (*Id.*), and that "it [was] only fair that we investigate thoroughly and fairly." (*Id.,* JA 327:11 – 12.)

### 1.    The CBA Investigative and Grievance Processes

As Sharif was a CSR and a member of the Union, United had to follow the investigative and grievance processes delineated in Article 9 of the CBA. (*See* JA 254.) In accordance with Article 9A of the CBA, United could not "discipline or discharge an employee without just cause." (*Id.*)

If United wants to question an employee as part of an investigation that could result in discipline against the employee, then United is required to inform the employee that "he/she has the right to have a Union representative present during the questioning." (*Id.*) Although the Union representative cannot interfere with United's questioning, United has to provide the Union representative with an opportunity to ask clarifying questions at the conclusion of United's questioning.

11

(*Id.*) United is also required to provide the Union representative with a reasonable opportunity to consult with the employee before questioning. (*Id.*) If United's investigation of an employee pertains to the employee's suspected participation in an unlawful or prohibited job action, or an act of fraud, then United does not have to pay the employee if it holds such employee out of work pending its investigation. (*Id.*)

Under the CBA, United cannot discipline or discharge an employee from employment "without a prompt, fair and impartial investigative hearing" ("IRH") at which the employee may be represented and assisted by Union representatives. (*Id.,* JA 254 – 255.) Prior to the IRH, United must inform the Union in writing of the precise charges against the employee as well as provide the Union and employee at least 48 hours advance notice prior to the IRH. (*Id.,* JA 255.) United and the Union must also "provide to each other copies of documents or records upon which they intend to rely" at the IRH. (*Id.*)

The IRH is conducted by a hearing officer, who is tasked with listening to presentations by United and the Union, and then determining whether United's proposed disciplinary action is reasonable or whether a different form of discipline is appropriate.[8] (David Merriman, Jr.'s Deposition Transcript ("Merriman Dep."),

---

[8]    Sharif experienced first-hand that a hearing officer isn't obligated to uphold United's proposed discipline. (JA 396 – 397.) In 2009, United sought to discipline

JA 386:1 – 389:15, 393:10 – 13.) The hearing officer presents his determination in a decision letter that is typically prepared within seven to ten days of the IRH. (*Id.*, JA 387:5 – 11.)

If United or the Union isn't satisfied with the hearing officer's decision, either party can then challenge the decision by going "directly to Step 3 of the grievance procedure using the rules and time limits which apply to that Step." (JA 256-260.) Under Step 3 of the CBA grievance process, the employee's appeal is reviewed by a "System Board," which consists of a representative from United, a Union representative, and a neutral member that is agreeable to United and the Union. (*Id.,* JA 258.) The System Board has the power to make "sole, final and binding decisions" with respect to the grievance. (*Id.*)

## 2.    United's April 23rd Meeting with Sharif and the Union

On April 23, 2014, Martin and Connor met with Sharif to find out Sharif's explanation for his March 30th absence from work. (JA 20 – 21 at ¶¶ 92 – 93.) They were joined by Elizabeth Trainum (Sharif's direct supervisor) as well as by Bill Huston, who attended the meeting as Sharif's Union representative in

---

Sharif for violating a rule prohibiting employees from fighting, threatening, coercing, intimidating or assaulting other individuals while on company property, during company business, or in other work-related circumstances. (*Id.*) United proposed "Level 4" discipline and the Union requested that the hearing officer deny United's proposed Level 4 discipline. (*Id.*) Ultimately, the hearing officer determined that Sharif should be assessed discipline at a "Level 3" rather than a Level 4 because of mitigating factors. (*Id.*)

13

accordance with the CBA. (*Id.*) Prior to the April 23rd meeting, United had not made any determinations regarding Sharif and his March 30th absence. (*See* Martin Dep., JA 327:11 -12, 609:1 – 4.)

The beginning of the meeting was "[v]ery calm; very smooth… a smooth conversation." (Martin Dep., JA 323:14 – 20.) However, Sharif's demeanor changed once Martin started to ask Sharif questions about his March 30th absence. (Martin Dep., JA 324:7 – 22; Jon Connor's Deposition Transcript ("Connor Dep."), JA 358:5 – 8.) Specifically, Sharif "kind of put his head down and sat silent for an amount of time; minutes of just being very silent; very calm, very silent." (Martin Dep., JA 324:10 – 22; Connor Dep., JA 358:10 – 11.) Furthermore, "[Sharif] looked into space as to try to think back. He wasn't looking at any of us directly, kind of looking out into the side where there would be nothing visual to look at." (Connor Dep., JA 358:14 – 16.) When Sharif did respond to Martin's questions about his March 30th absence, "his responses were jumbled." (Martin Dep., JA 324:18 – 22.) To Martin and Connor, Sharif's demeanor was that of someone who wasn't being truthful. (Martin Dep. JA 337:2 – 6; *see* Connor Ltr., JA 377 – 378.)

Additionally, Sharif's inconsistent answers to Martin's questions gave Connor and Martin the impression that Sharif wasn't being truthful. (*Id*.) According to Martin's transcribed notes from the April 23rd meeting, Sharif

14

answered as follows with respect to the circumstances surrounding his March 30th

absence from work:

| | |
|---|---|
| Martin: | Where did you travel on March 30, 2014? |
| Sharif: | I was stuck in Capetown on March 30th. There was a jazz festival and all the flights were full. I a (sic) ZED on Turkish to go to Istanbul and could not get out. I went out the next day (March 31, 2014) Emirates to Dubai.[9] |
| | |
| Martin: | Were you scheduled to work on March 30, 2014? |
| Sharif: | I was not scheduled. |
| | |
| Martin: | If you were not scheduled, why did you call out FMLA for March 30, 2014? |
| Sharif: | (many pauses, lengthy thought process) I do not recall being out sick this day or calling out sick. I can't remember trying to think. (after a long silence) I don't know if I called out sick or my wife did for me. There was a Jazz festival and we could not get out of Capetown and due to my illness, I started not to feel well. I had purchased ZED fares on many different carriers to get out of Capetown by everything was full.[10] |
| | |
| Martin: | How were you planning to get to IAD for your shift that day when you were trying to fly out on the March 30, 2014? |
| Sharif: | We were trying on the 29th. |
| | |
| Martin: | Your story changed, you told me that you were traveling on the 30th before? |
| Sharif: | I was trying since the 29th. |

---

[9]   According to Connor's testimony, Sharif said that he and his wife "had decided to attend the festival." (Connor Dep., JA 355:9 – 355:14.)

[10]  A "ZED" fare is an employee-reduced fare ticket. (Connor Dep., JA 361:8 – 14.)

15

(*See* JA 344 – 345.)[11]

Martin testified that it didn't appear as if Sharif was anxious during the April 23rd meeting and there was no indication of unrest; instead, it appeared that Sharif "was running through his mind… what happened that day, because what happened wasn't what he had told us." (Martin Dep., JA 325:1 – 15.)

At the conclusion of the meeting, Martin asked Sharif if he could provide him with any proof of the "stand-by tickets" that Sharif alleged he had bought on many different airlines. (*Id.*, JA 327:4 – 10.) Martin told Sharif that any such proof (*e.g.,* boarding passes, receipts, etc.) would be an important part of the investigation. (*Id.*)

Additionally, Martin asked Sharif to prepare a written statement regarding his explanation for his absence on March 30th. (*Id.,* JA 327:14 – 16.) With the aid of his Union representative, Sharif wrote:

> On the 29th of March, when I was on my vacation and tried to take a flight to U.S. by a different carrier to Europe or anywhere else. There were an unpredicted jazz festival in Capetown. So that made it impossible to make it out of the Capetown. We try any airline. We called any airline, but there was no hope to get out of that city. The pressure was so much that I got on my panic attack situation, so it made me sick on the 30th while I was trying to get home to make it to work. And then we got

---

[11]   Sharif concedes that he made each of the statements that were attributed to him in Martin's transcribed notes. (Sharif Dep., JA 205:13 – 206:16.)

> lucky and got out; made it out on the 31st from Capetown to
> Dubai and to Milan and U.S.

(*See* Sharif Dep., JA 537.)

At the end of the meeting, Martin informed Sharif that he was suspended pending further investigation. (*See* JA 21 at ¶ 104.)

### 3.    Martin and Connor Confer on Investigation

In the days following the April 23rd meeting, Martin and Connor discussed the investigation and what transpired in the meeting. (Martin Dep., JA 335:6 – 15, 615:7 – 9.) Based on the manner in which Sharif responded to questions during the April 23rd meeting and the information that was gathered during the investigation, neither Martin nor Connor believed that Sharif was being truthful about his intent to return from Cape Town in time for his work shift on March 30th. (Martin Dep., JA 337:2 – 6; *see* Connor Ltr., JA 377 - 378.)

Specifically, with respect to his thoughts about the April 23rd meeting, Martin testified:

> "The conversation that we were having in the beginning was
> very -- very friendly; very jovial, in fact, and he was telling
> about his vacation and things. And, then, when the part came up
> where we talked about being scheduled to work on March 30th,
> and he said he wasn't, and then I asked why he -- why he would
> have called out sick that day, his reaction to that question and
> his head being down and his expression was just – just sitting
> still and looking down, to me, was – I honestly believe that he
> just was not telling me the truth. I honestly believe he did not
> tell me the truth that day. And based upon the flight schedules

17

> and those type of things and the one day that's not covered and
> he called out, I just didn't believe him.

(Martin Dep., JA 617:12 – 618:6.)

Both Martin and Connor agreed that Sharif violated United's Honesty Policy and that the termination of his employment was warranted. (JA 376; Connor Ltr., JA 377 – 378.)

### 4.    Martin Confers with United's Senior Management at Dulles

Within a few days after his conversation with Connor, Martin spoke to Bill Watts (United's Director of Customer Service at Dulles) about the investigation. (Martin Dep., JA 614:11 – 13, JA 620:11 – 22.) He explained the nature of the investigation; the questions and responses that Sharif gave during the April 23rd meeting; and, that both he and Connor were in support of termination. (*Id.*, JA 621:1 – 4.) Watts was in agreement with Martin and Connor on the proposed course of action. (*Id.*, JA 621:7 – 9.) Martin also spoke to Rodney Cox (United's General Manager at Dulles) about the investigation and Cox also supported Sharif's termination. (*Id.*, JA 614:11 – 15; JA 616:9 – 15; JA 621:7 – 18.)

On May 2, 2014, Martin sent an email to United's senior management at Dulles to advise them of the investigation as well as the conclusions shared by he and Connor. (JA 376.) Specifically, Martin stated

> Jon Connor and I have finished the investigation into [Sharif's]
> FMLA call while out on vacation. In a nutshell, he had all but

18

> one day covered, called out FMLA in South Africa on the morning he was supposed to be to work. He then traveled to MXP and stayed a few extra days there. When we questioned him, he was not truthful and told us initially that he didn't have to work that day. He then changed his story many times. He had no intentions of being at IAD that day. We are recommending termination and wanted your input .....

(*Id.*) United's senior management authorized Martin and Connor to proceed with terminating Sharif. (*See* Martin Dep., JA 614:11 – 15, 621:7 – 18.)

### G.    United's Proposed Termination of Sharif's Employment

After receiving approval from United's senior management at Dulles to proceed with the termination process, Martin drafted a letter to Sharif for Connor's review and execution. (Connor Dep., JA 371:5 – 17.) The letter, which had a subject line of "Proposed Termination," detailed numerous inconsistencies with Sharif's proffered explanation for his March 30th absence. (JA 377 – 378.) The letter stated, in part, that Sharif

> fraudulently claimed an FMLA qualifying illness as the reason for your absence on a day that you were scheduled to work and that you did not have coverage for when you left the United States. It is clear that you left for vacation with no intention of coming to work on March 30, 2014. You also made a false statement during the investigation when you claimed that you were not scheduled to work, then, acknowledged that you were scheduled to work but that to *[sic]* you were unable to return because you were sick due to stress from travel.

(*Id.*)

19

The letter further stated that Sharif's dishonesty constituted a violation of United's Honesty Policy, which "includes an expectation that employees be truthful in all communications; to act in ways that reflect favorably on the Company and themselves; to use good judgment and open communication in all decisions." (*Id.*) In light of Sharif's false statements, United concluded that Sharif "clearly" did not meet "these expectations." (*Id.*)

On May 15, 2014, Connor and Trainum met with Sharif, Bill Huston (Union representative), and Barbara Martin (Union grievance committee). (Connor Dep., JA 372:2 – 9.) At the meeting, Connor provided Sharif with a copy of the letter that Martin had drafted for Connor's execution and informed Sharif of United's decision to propose the termination of his employment for failing to comply with the United's Honesty Policy. (*See id.*, JA 372:9 – 12.)

## H.    Sharif's Investigative Review Hearing

Sharif's IRH was scheduled for June 5, 2014 and the hearing officer assigned to conduct the hearing was David Merriman, Jr. (*See* JA 22 at ¶ 109.) There were four Union representatives present at Sharif's IRH. (Sharif Dep., JA 212:2 – 10.) The Union representatives repeatedly advised Sharif that he should retire as it was unlikely, in their opinion, that the IRH decision would be favorable to him. (JA 22 at ¶¶ 113 – 114.)

## I.      Sharif Retires Prior to IRH Determination

On June 9, 2014, before Merriman rendered his IRH decision, Sharif informed his Union representatives that he had decided to retire. (JA 398; JA 812-813.)

## SUMMARY OF ARGUMENT

As Sharif has not appealed the District Court's dismissal of his age discrimination claim, his sole argument on appeal pertains to his claim that United purportedly retaliated against him in violation of the FMLA. The District Court's granting of summary judgment in favor of United on Sharif's FMLA retaliation claim should be affirmed.

First, Sharif cannot now assert any argument that is premised on direct and indirect evidence or the mixed-motive framework as Sharif has waived his right to raise such arguments by failing to present them before the District Court and by further failing to articulate any "exceptional circumstances of plain error or a fundamental miscarriage of justice" in his Opening Brief.

Assuming arguendo this Court finds that Sharif has not waived his direct and indirect evidence arguments, Sharif has still failed to satisfy the requisite burden, which requires him to present conduct or statements that directly reflect the alleged retaliatory attitude and directly bear on the contested employment decision. As

Sharif has produced no such evidence, he is relegated to solely relying on the pretext framework to withstand summary judgment on his FMLA retaliation claim.

Second, the District Court properly concluded that Sharif failed to present sufficient evidence to maintain his FMLA retaliation claim under the pretext framework. Indeed, Sharif has not and cannot rebut United's legitimate, non-retaliatory reason for proposing his termination – namely, that United proposed Sharif's termination for violating the company's Honesty Policy.

Although Sharif bears the ultimate burden of persuading the trier of fact of retaliation, he has not put forth even a scintilla of evidence to support that United's proffered reason was false or that United was motivated by an intention to retaliate against him for using FMLA leave to excuse his work absence on March 30th. Sharif failed to present any legitimate comparator evidence. In fact, the comparator evidence that Sharif relies upon undermines his retaliation claim as the purported comparator is still employed by United.

Also, as the District Court correctly held, Sharif's contention that United's penalty for Sharif is unduly harsh in light of the company's penalties for an employee who calls out sick or a "no show no call" absence, as there is nothing in the FMLA that prevents an employer from ensuring that its employees don't abuse FMLA leave or an employer's decision to consider workplace fraud a serious issue.

22

Lastly, the District Court properly rejected Sharif's argument that United's investigation was "badly flawed" and "unbusinesslike." It is well settled law that it is not within a court's province to decide whether an employer's adverse action was wise, fair or correct; that is especially true in this instance, where United complied with the grievance processes set forth in its collective bargaining agreement with Sharif's Union. Moreover, as the District Court noted, Sharif was fully represented by his Union throughout the investigative process.

As Sharif failed to establish an FMLA retaliation claim, the District Court properly granted summary judgment in United's favor.

## **ARGUMENT**

## I.    **STANDARD OF REVIEW**

This Court reviews the District Court's grant of summary judgment to United *de novo*. *Covenant Media of South Carolina, LLC v. City of North Charleston*, 493 F.3d 421, 427 (4th Cir. 2007); *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir. 2004).

To defeat a properly founded motion for summary judgment, the non-moving party may not rest upon a "mere scintilla" of evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). Nor can the non-moving party rely upon "mere speculation or the building of one inference upon another" to avoid dismissal of the action. *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (internal

quotation marks and citation omitted); *see also Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.") Instead, the non-moving party must "go beyond the pleadings" and come forward with evidence that meets the evidentiary standards that would apply at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

It is in this regard that Sharif's position fails, as he did not, at the District Court level, provide the necessary specific facts and evidence to generate a dispute of material fact to create a triable issue on his FMLA retaliation claim.

## II.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT SHARIF FAILED TO PRESENT SUFFICIENT DIRECT EVIDENCE TO PROCEED WITH HIS FMLA CLAIM

Sharif alleges that United "unlawfully retaliated" against him "in violation of the FMLA by terminating his employment because he requested FMLA leave." (JA 24 at ¶ 136.) As FMLA retaliation claims are analogous to discrimination claims brought under Title VII, a plaintiff can withstand summary judgment by either (1) presenting direct and indirect evidence of retaliation; or, (2) satisfying

the burden-shifting pretext framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015); *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). Direct evidence encompasses conduct or statements that (1) directly reflect the alleged retaliatory attitude; and, (2) directly bear on the contested employment decision. *Foster*, 787 F.3d at 249; *see Cline v. Roadway Exp., Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)(holding that the evidence must show that "the employer announced, or admitted, or otherwise unmistakably" indicated that age was a determining factor without "resort to any special judicially created presumptions or inferences related to the evidence" and the evidence must "rationally be drawn independently of any presumption").

As Sharif failed to present any such evidence before the District Court, he is relegated to solely relying on the *McDonnell Douglas* pretext framework to withstand summary judgment.

## A.     Sharif has Waived his Direct Evidence and Indirect Evidence Arguments

It is well-established that, in reviewing a summary judgment order, an appellate court is limited to those matters that were presented to the district court. *Estate of Weeks v. Advance Stores Co.*, 99 F. App'x 470, 474 (4th Cir. 2004). As such, a "party's failure to raise an issue in a complaint or opposition to summary

25

judgment constitutes a waiver of that issue." *Id.* In order to raise an issue for the first time on appeal, a party must show that there are "exceptional circumstances of plain error or a fundamental miscarriage of justice." *Id.*

Although Sharif extensively argues that the District Court's dismissal of his FMLA retaliation claim should be reversed because he presented sufficient direct and indirect evidence of retaliation for his case to proceed, he is procedurally barred from relying upon such arguments on his appeal.[12] (Appellant's Brief ("Appellant Br.") at 29 – 35.)

First, Sharif failed to raise his direct and indirect arguments (that he now attempts to assert in his Brief to this Court) in the District Court. Indeed, Sharif's Opposition to United's Motion for Summary Judgment was ***wholly premised*** on his contention that there was sufficient evidence to proceed with his FMLA retaliation claim under the *McDonnell Douglas* pre-text framework. As the District Court noted, ***Sharif did not make any direct evidence argument until during the summary judgment hearing***, at which time his sole argument was that Connor's

---

[12] In support of this argument, Sharif claims that Hasser's March 31, 2014 email to Martin constitutes direct evidence that United was "motivated by retaliation against Sharif for having taken protected FMLA leave." (*Id.,* at 29 – 30.) Furthermore, Sharif argues that evidence regarding United's purported departure from "normal procedures and standards," the company's treatment of "comparator" LaTonya Love-Franks, and the "unbusinesslike" nature of United's investigation into his March 30th absence constitute sufficient indirect evidence in support of his alleged direct evidence. (*Id.*, at 31 – 35.)

May 15, 2015 letter constituted sufficient direct evidence to bypass *McDonnell Douglas*.[13] (JA 928.) Accordingly, at most, Sharif could only raise the Connor May 15th letter direct evidence argument on appeal;[14] however, as he has failed to do so in his Brief, he cannot make any direct or indirect evidence argument now.[15]

Moreover, Sharif is also procedurally barred from asserting his direct and indirect evidence arguments on appeal because he has failed to show that there are "exceptional circumstances of plain error" or that there was "a fundamental miscarriage of justice." In fact, there are no such circumstances that would justify this Court's consideration of his the direct and indirect evidence arguments that he has raised, for the very first time in this litigation, on appeal.

### B.    Sharif Has Waived his Mixed-Motive Argument

Sharif is also foreclosed from asserting a mixed-motive argument on appeal because he failed to raise such argument before the District Court and he has not proffered any exceptional circumstances or alleged any potential miscarriage of

---

[13]  In his May 15, 2015 letter, Connor advised Sharif that United had concluded its investigation into his March 30th absence and that it was going to propose his termination for failing to comply with its Honesty Policy. (JA 377.)

[14]  Although Sharif did argue that Hasser's March 31st email constituted direct evidence at the District Court level, he only did so in cursory fashion in a supplemental brief that he filed ***after the summary judgment hearing***. (JA 920 – 921.)

[15]  Similarly, as Sharif did not raise any indirect evidence argument before the District Court, he is precluded from doing so on appeal.

justice in his Brief. Furthermore, in light of the Supreme Court's decision in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013), in which the Supreme Court held that the lessened causation standard only applies to Title VII discrimination plaintiffs, and that Title VII retaliation plaintiffs are limited to the "traditional principles of but for causation," Sharif cannot rely upon a mixed-motive framework in support of his FMLA claim. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d at 249 (stating that *Nassar* has "significantly altered the causation standard for claims based on direct evidence of retaliatory animus by rejecting the 'mixed motive' theory of liability for retaliation claims.")

## C.    Sharif Failed To Establish That United Was Motivated By A Retaliatory Animus

*Assuming arguendo* this Court finds that Sharif has not waived his direct and indirect evidence arguments, Sharif has nonetheless failed to present any conduct or statements that directly reflects the alleged retaliatory attitude and directly bears on the contested employment decision. *Foster*, 787 F.3d at 249.

The first direct evidence argument that Sharif attempts to raise in his Brief relates to Hasser's March 31st email to Martin.[16] (*See* Appellant Br. at 29 – 30.) Specifically, Sharif avers that "a reasonable jury could infer that Hasser's reference

---

[16]  Hasser's March 31st email merely states, *verbatim*, "Called out FMLA for yesterday, Sunday. This was the only day he didn't have covered for his vacation trip out of the country. It coordinates with his wife's MARS calendar - F. Sharif - 305708. He did the same thing last September, 2013. Just an FYI." (JA 721.)

28

[in her March 31st email] to Sharif's FMLA leave in September 2013" was a "but for" cause for the investigation that culminated in United proposing Sharif's termination. (*Id.,* at 30.)

Sharif's argument is entirely without merit. There is nothing in Hasser's email that disparages FMLA leave or disparages Sharif's taking of FMLA leave. Nor is there anything in Hasser's email that illustrates an alleged retaliatory attitude or directly bears on United's proposed termination of Sharif's employment. In fact, there is no evidence in the record that Hasser was a decisionmaker with respect to initiating the investigation into Sharif's March 30th absence, that she was even involved in the investigation, or that she was a decisionmaker or even involved with United's decision to terminate Sharif's employment.

Clearly, as evidenced by Hasser concluding her email with "Just an FYI," she was merely advising Martin of a potential issue regarding Sharif's March 30th absence. Certainly, a factfinder could not rationally conclude – independently of any substantial inferential presumption – that Hasser's email rises to the level of direct evidence.

Additionally, Sharif's argument that United's purported failure to pay him during the investigation is further direct evidence of retaliatory animus is also without merit. (Appellant Br. at 31.) Not only does this alleged conduct fail to

29

reflect United's retaliatory attitude about Sharif taking FMLA leave on March 30th, but this alleged conduct does not directly bear on the proposed termination. To the contrary, Sharif's argument is belied by the CBA, which specifically provides that if the investigation pertains to the employee's suspected participation in an unlawful or prohibited job action, or an act of fraud, then United does not have to pay the employee if it suspends the employee pending its investigation. (JA 254.) As whether Sharif engaged in fraud (*i.e.,* violating the company's Honesty Policy) was the subject of United's investigation, Sharif was not entitled to receive payment during his suspension.

## III.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT SHARIF FAILED TO ESTABLISH HIS FMLA RETALIATION CLAIM UNDER THE *MCDONNELL DOUGLAS* FRAMEWORK

As an alternative to the mixed-motive framework, a plaintiff may rely upon the *McDonnell Douglas* pretext framework to establish an FMLA retaliation claim. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006). The first step under the *McDonnell Douglas* framework requires the plaintiff to establish the *prima facie* elements for an FMLA retaliation claim. *Yashenko*, 446 F.3d at 551. It is well established in this Circuit that, in order to satisfy this burden, the plaintiff must show that (1) he was engaged in a protected activity; (2) he suffered an adverse employment action; and, (3) there was a causal connection

30

between the employer's adverse action and the plaintiff's engagement in the protected activity. *Id.*

**A.    Sharif Has Failed to Establish a *Prima Facie* Case for FMLA Retaliation**

Sharif has not satisfied each of the requisite *prima facie* elements for an FMLA retaliation claim as he has failed to present sufficient evidence in support of the causal connection prong. Indeed, the only evidence in the record upon which Sharif can rely is the temporal proximity between his use of FMLA leave on March 30th and United's decision to propose his termination on May 15th.[17] Such evidence far from conclusively establishes the requisite causal connection. *Yashenko*, 446 F.3d at 551.

Apart from temporal proximity evidence, the undisputed record clearly shows that the basis for United's proposed termination was Sharif's violation of United's Honesty Policy. (*See* JA 376; JA 377 – 378.) Neither Martin nor Connor believed that Sharif was being truthful about his intent to return from Cape Town in time to work his shift on March 30th. (Martin Dep., JA 337:2 – 4; *see* Connor Ltr., JA 377 – 378.) Additionally, this sentiment was further reflected in Connor's May 2, 2014 email to United's senior management at Dulles Airport, which stated

---

[17]   As detailed in its Memorandum in Support of Summary Judgment, United contests that it terminated Sharif as he voluntarily retired prior to an IRH decision; therefore, Sharif also failed to satisfy the adverse action prong of the *prima facie* analysis.

"[w]hen we questioned him, he was not truthful and told us initially that he didn't have to work that day. He then changed his story many times. He had no intentions of being at IAD that day." (JA 376.) And, Connor's May 15, 2014 letter to Sharif, which outlined the basis for United's decision to propose Sharif's termination, also made it clear that United's decision was based on Sharif's dishonesty and violation of the Guidelines' requirement that employees "be truthful in all communications." (JA 377 – 378.)

The mere fact that Sharif's fraudulent statements involved his alleged use of FMLA leave does not mean that United's decision to propose his termination was rooted in a retaliatory motive for such use. Indeed, United approved each of Sharif's annual requests for intermittent FMLA leave and he took FMLA leave on 56 occasions between August 2012 and June 2014 without suffering any repercussions from United. (*See* JA 17 at ¶ 50; *see* JA 283 – 284.) United also approved Sharif's use of FMLA leave after the March 30th incident. (*See* JA 284.)

Without any additional evidence apart from temporal proximity, Sharif cannot establish a causal connection based on the evidence in the case.

### B.  United Proffered a Legitimate, Non-Retaliatory Reason for Proposing Sharif's Termination

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the employer, who must put forth a legitimate, non-retaliatory reason for the purported

adverse action. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). The employer's burden is "a burden of production, not persuasion." *Id* at 214.

The District Court properly concluded that United satisfied its burden by presenting undisputed evidence that it proposed Sharif's termination, not in retaliation for using FMLA leave, but because he violated the company's Honesty Policy.

## C. Sharif Failed to Establish That United's Legitimate, Non-Retaliatory Reason for Proposing His Termination Was Pretextual

Under the *McDonnell Douglas* framework, after an employer satisfies its burden to articulate a legitimate, non-retaliatory reason for the adverse action, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Holland,* 487 F.3d at 214. In other words, as the District Court noted, the plaintiff must not only offer proof showing that the defendant's explanation was false, the plaintiff must also establish that the defendant's actions were motivated by its intention to retaliate against the plaintiff. *See St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 515-16 (1993)(holding "[A] reason cannot be

proved to be a pretext for [retaliation] unless it is shown both that the reason was false, and that [retaliation] was the real reason.")

As, at all times, the plaintiff bears the "the ultimate burden of persuading the trier of fact" of retaliation, the plaintiff is "not entitled to a trial on the merits unless he establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not" that the employer's adverse action was the product of retaliation. *Darvishian v. Geren*, 404 F. App'x 822, 828 (4th Cir. 2010).

The District Court properly held that Sharif failed to present any evidence that United's legitimate, non-retaliatory reason for proposing his termination was merely pretextual. (Summary Judgment Memorandum Opinion ("Mem. Op." at 15.) Indeed, Sharif has not established a factual record that even remotely demonstrates that United's proffered reason was false. Nor has Sharif put forth any evidence that United was motivated by an intention to retaliate against him for using FMLA leave on March 30th.

Instead, Sharif erects multiple strawman arguments in furtherance of attempting to create material disputes and for the purpose of distracting this Court from the simple reality that his entire case is based on nothing more than idle conjecture and speculation. Once this smoke is cleared, it becomes readily apparent that Sharif lacks any cognizable evidence to cast doubt on the veracity of United's articulated legitimate, non-retaliatory reason for proposing his termination.

34

Upon examining the *undisputed* facts pertaining to how United reached its decision to propose Sharif's termination, it is clear that this Court should affirm the District Court's dismissal of Sharif's FMLA claim. Contrary to Sharif's assertion that United's investigation was so "badly flawed" and "unbusinesslike" that a reasonable jury could infer that it was a "cover-up for retaliation," (Appellant Br. at 47 – 53), the undisputed evidence establishes that United complied with the CBA in conducting its investigation.

To properly place United's investigation in the proper context, it is important to first acknowledge that courts should "not sit as a kind of super-personnel department weighing the prudence" of an employer's decisions. *DeJarnette v. Corning Inc.*, 133 F.3d 292, 299 (4th Cir.1998) (*quoting Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410-411 (7th Cir.1997)). As, [i]t is not the court's province to decide whether the employer's proffered non-retaliatory reason for the adverse action was wise, fair or even correct," a reviewing court should not focus on alleged flaws in the investigative process. *Id.*; *see Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)(holding that a court "should resist attempting to micro-manage the process used by employers in making their employment decisions ….").

Even if United's investigation wasn't optimal in Sharif's eyes, United nonetheless conducted its investigation in the manner proscribed by Article 9 of

35

the CBA. In accordance with the CBA, there was a Union representative present during the April 23rd meeting and the representative was provided an opportunity to ask clarifying questions.[18] (JA 292 at ¶¶ 69 – 70; *see* Martin Dep. JA 334:7 – 8.) Additionally, in accordance with the CBA, United provided Sharif and the Union with written notice of the company's detailed conclusions from its investigation as well as United's proposed discipline on May 15th. (Connor Dep., JA 372:9 – 12.; *see* JA 377 – 378.) Also, United scheduled Sharif's IRH for nearly 3 weeks after providing him with the May 15th letter, which afforded him with substantially more time to prepare his defense than the CBA's mandated minimum of 48 hours between the notice of proposed discipline and the IRH. (*Id.*)

As the District Court properly recognized, Sharif's contention that United's investigation was flawed is belied by the undisputed fact that he was represented by the Union throughout the entire investigation and grievance process. (Memorandum Op. at 13 – 14.) He had a Union representative at United's April 23rd investigative meeting; he had two Union representatives present at the May 15th meeting where United advised him of its decision to propose his termination.

---

[18] Although Sharif contends that United didn't abide by the CBA because he supposedly wasn't afforded an opportunity to discuss this matter with his Union representative prior to the start of the April 23rd meeting, he has put forth no evidence that he was denied such opportunity. Furthermore, there is no language is no language in the CBA that obligates the Company to allow Sharif to speak with his Union representative prior to an investigative meeting.

And, Sharif had four Union representatives present at the IRH hearing. If, as Sharif represents, the investigation was conducted in a manner that he thought was less than satisfactory or fair, then his real gripe directly lies with the representation he received from the Union.

Not only did United comply with the CBA with respect to conducting its investigation process, but United also took reasonable steps to determine the legitimacy of Sharif's March 30th absence. Sharif's contention that United's investigation should have focused more on whether he was justified in using FMLA leave on March 30th is of no relevance. United didn't propose Sharif's termination because he used FMLA leave; it proposed his termination because he violated United's Honesty Policy. (JA 377 – 378.)

United's investigation was more than sufficient to determine whether Sharif was being truthful about whether he intended to return in time to make his shift on March 30th. Indeed, after receiving Hasser's March 31st email, Martin:

- pulled Sharif's and his wife's work calendars, (*Id.*, JA 315:2 – 5);

- researched various information from United's reservation system to determine when the Sharifs booked their reservations and their flight schedules, (*Id.*, JA 315:7 – 17);

- investigated the telephone number from which Sharif called on March 30th to take FMLA leave, (*Id.*, JA 315:18 – 22);

37

- arranged the April 23rd meeting with Sharif (although he wasn't required to do so under the CBA) so that he could hear first-hand Sharif's version of events, (JA 609:1 – 4);

- afforded Sharif an opportunity, with the assistance of his Union representative, to provide a written account of his version of events, (JA 327:14 – 16);

- afforded Sharif an opportunity to provide any documents in support of his version of what transpired, (JA 327:4 – 10); and,

- discussed the investigation and the proposed course of action with Connor and several other senior members of United's Dulles facility, (Connor Dep., JA 608:20 – 609:13; Martin Dep., JA 614:11 – 13, JA 621:1 – 4, JA 614:11 – 18; JA 376.)

Furthermore, United had ample support from its investigation to conclude that Sharif was not truthful about his intentions to return in time for his shift on March 30th. It is well established that "ultimately, it's the perception of the decisionmaker which is relevant" in the pretext analysis. *Holland v. Washington Homes, Inc.*, 487 F.3d at 217. As United clearly established, its perception of Sharif was based on the following uncontroverted facts:

- Sharif and his wife both attempted to coordinate their work schedules so that they would have off from March 16th – April 4th for their trip to South Africa and Italy. (JA 18 at ¶ 66; *see* JA 283 – JA 286; *see* Undisputed Facts, JA 113 – 114 at ¶¶ 14 – 15; JA 410.)

- Two days prior to departing for vacation, Sharif sought to have someone cover his work shifts for March 30th and March 31st – which just happened to be the only two remaining work shifts that he was unable to take off. (SA 1 – 10; JA 144, RFA Nos. 21 – 22.)

38

- After someone agreed to pick up his March 31st work shift, Sharif's March 30th shift was the only shift that he remained scheduled for during the period from March 16th – April 4th. (*See* JA 283 – 284; *see* Undisputed Facts, JA 113 – 114 at ¶¶ 14 – 15; JA 410.)

- Even though Sharif was scheduled to work on March 30th, he did not make any advance reservations for a return flight. (JA 19 at ¶ 73.)

- Although Sharif purportedly purchased multiple standby tickets in furtherance of trying to depart in time to make his March 30th shift, he failed to produce any evidence of such purchases during United's investigation. (See JA 344 – 345.)

- Sharif's alleged anxiety attack occurred after the last flight that he could have taken to make it back in time for his March 30th shift. (Sharif Dep., JA 194:1 – 17; see JA 20 at ¶ 83.)

- Sharif just happened to have an anxiety attack requiring him to take FMLA leave on March 30th – the only day that he was unable to take off or get coverage for prior to departing for vacation. (JA 20 at ¶ 83.)

- Even after Sharif was able to secure a flight out of Cape Town, he and his wife spent two days in Milan, Italy visiting Sharif's niece prior to returning home. (JA 146 – JA 147, RFA Nos. 28 and 29.)

- Sharif just happened to return to the Washington, DC area on April 3rd – the day before his wife was scheduled to return to work. (*See* Undisputed Facts, JA 113 – 114 at ¶¶ 14 – 15; JA 410.)

- Sharif's demeanor considerably changed during the April 23rd meeting after he was asked specific questions about his March 30th absence. (Martin Dep., JA 324:10 – 21; Connor Dep., JA 358:5 – 8.)

- When Sharif finally did answer questions about his March 30th absence during the April 23rd meeting, his responses were jumbled and inconsistent. (Martin Dep., JA 324:18 – 22.)

Additionally, Sharif repeatedly changed his version of events with respect to his March 30th absence. (*See* JA 344 – 345.) First, Sharif stated that he wasn't scheduled to work on March 30th and that he supposedly spent that day trying to depart Cape Town. (*Id.*) However, when Martin asked Sharif why he called out of work on March 30th if he wasn't scheduled, Sharif then said that he did "not recall being out sick [that] day or calling out sick." (*Id.*) And, when Martin asked him how he was planning to arrive in time to make his March 30th shift if he didn't try and leave Cape Town until that date, Sharif then changed his story again and said that he was trying to depart Cape Town on March 29th. (*Id.*)

Although Sharif characterizes United's investigation as some grandiose conspiracy between Hasser, Connor, and Martin to retaliate against him, he has not put forth even a scintilla of evidence to rebut any of the facts upon which United based its decision to propose his termination. Instead, in an effort to taint the legitimacy of United's investigation, Sharif alleges that United should have considered certain facts and documents that were presented during the discovery process in this litigation matter. However, Sharif could have – but did not – raise such facts and documents when he had the opportunity to do so during the

investigation. In fact, Sharif voluntarily opted to retire in lieu of proceeding with the CBA grievance process.

United's decision can only be judged on the basis of the "particularized facts before it at the time" that it made its decision. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Based on the plethora of "particularized facts" that it had before it, United reached a reasoned and thoughtful decision. The mere fact that Sharif disagrees with United's decision and thinks it was unfair does not satisfy his burden of establishing pretext.

### 1. Sharif has not Presented any Legitimate Comparator Evidence

In *Laing*, the Fourth Circuit extensively noted the importance of a plaintiff's use of comparator evidence to satisfy the pretext requirement under *McDonnell Douglas.*[19] *Laing*, 703 F.3d at 719. In stating that "federal courts now routinely rely on comparator evidence when deciding whether an adverse employment action was driven by discriminatory motive," this Court further noted that

> [u]nlike a free-form evaluation of the "constellation" of contextual considerations that might inform whether a

---

[19] To rely on comparator evidence, a plaintiff must prove that the employees "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir.1994)(*citing The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)).

> particular workplace decision was unlawfully motivated, comparator evidence is more objective in nature…. Adjudicating discrimination claims based on comparator evidence thus mitigates the risk of judges inserting their own subjective value judgments in place of facts and settled law.

*Id.* at 719-720. While recognizing that comparator evidence is not "the final answer in discrimination law," this Court recognized that "where an employer adduces a nondiscriminatory reason for discharging the plaintiff and comparator evidence does not exist to rebut that explanation, the plaintiff must be able to point persuasively to some other form of evidence demonstrating that the employer's explanation was a mere pretext for discrimination." *Id.* at 720.

The only comparator offered by Sharif is LaTonya Love Franks. (*See* Appellant Br. at 32 – 33.) While Sharif avers that Love Franks is a suitable comparator in support of his FMLA retaliation claim, the fact of the matter is that United's treatment of Love Franks buttresses United's legitimate, non-retaliatory reason for proposing Sharif's termination.

With Love Franks, United learned that she had attempted to use FMLA leave to excuse her absence from a work shift while she was on vacation. (JA 23 at ¶¶ 122 – 123.) As was the case with Sharif, United conducted an investigation; concluded that Love Franks violated the Honesty Policy; and, proposed her termination. (Martin Dep., JA 305:19 – 306:4.)

However, unlike Sharif, Love Franks opted to fully pursue the investigative and grievance processes under the CBA. (Martin Dep., JA 302:7 – 14.) She received a decision from an IRH hearing officer, which supported United's termination of her employment. (*Id.*, JA 302:16 – 305:10.) Thereafter, she elected to challenge the IRH hearing officer's decision through the CBA grievance process; and, during the course of the grieving process, United and the Union entered into a settlement agreement, pursuant to which Love Franks was reinstated. (*Id.*, JA 302:1 – 6.)

United's treatment of Love Franks supports United's position in this case in two fundamental ways. First, United's proposed termination of Love Franks for failing to comply with its Honesty Policy reinforces the legitimacy of the reason that United articulated for proposing Sharif's termination. By treating Sharif and Love Franks in the exact same manner after they violated the exact same policy in almost identical fashion, United clearly demonstrated the importance of its employees' adherence to the company's Honesty Policy; and that United is willing to terminate an employee who violates its policy.

Second, the fact that Love Franks is still employed by United directly rebuts Sharif's argument that United's proposed termination of his employment is pretextual. If United was truly motivated by an intent to terminate employees who used FMLA leave, then it wouldn't have reinstated Love Franks. Accordingly, as

43

the District Court properly concluded, Sharif cannot rely on Love Franks as a comparator. (Mem. Op., JA 941.)

### 2. Sharif has not Presented Any Evidence To Rebut United's Legitimate, Non-Retaliatory Reason for Proposing His Termination

Without the benefit of Love Franks as a comparator, Sharif must "point persuasively to some other form of evidence" in order to satisfy his pretext burden under *McDonnell Douglas*. *Laing*, at 719-720. However, not only has Sharif failed to present any evidence that United was motivated by a retaliatory animus, he has also failed to offer any evidence to rebut the undisputed evidence that United's actions were not retaliatory in nature.

Sharif has not presented any evidence that United has either terminated or taken an adverse action against any employee in retaliation for using FMLA leave. (Martin Dep., JA 309:2 – 310:19.) Moreover, Sharif has not presented any evidence to suggest that United retaliated against his use of FMLA leave on any other occasion. To the contrary, it is undisputed that United routinely approved Sharif's annual request for paid intermittent FMLA leave from 2009 through his retirement in 2014. It is further undisputed that from August 2012 through June 2014, Sharif used FMLA leave on 56 occasions without issue. And, it is undisputed that United even approved FMLA leave that Sharif took after the March 30th incident.

Sharif has also failed to put forth any even a scintilla of cognizable evidence to contradict the wealth of proof that United has offered to establish that neither Martin nor Connor were motivated by any retaliatory animus. Martin and Connor both testified that they approached the investigation with an open mind and that it was important that they provide Sharif with a fair opportunity to convey his side of the story. (*See* Martin Dep., JA 327:11 -12, 609:1 – 4.) Furthermore, Martin's May 2nd email to United's senior management at Dulles and Connor's May 15th letter to Sharif both plainly and unequivocally make it clear that United's reason for proposing Sharif's termination was solely based on its belief that he wasn't truthful as was required by the company's Honesty Policy. (*See* JA 376; JA 377 – 378.) All Sharif offers in support of his contention that the April 23rd meeting "was just a formality to provide an excuse for retaliation" and that United's investigation "was entirely for show, to conceal FMLA retaliation," (Appellant Brief at 50 and 52), is conclusory and unsupported statements.

In *Laing*, this Court observed

> [w]e think it plain that Laing has failed to establish a genuine, triable issue. In other words, in attempting to defend the conduct that led to her termination, all Laing has proven is the unexceptional fact that she disagrees with the outcome of FedEx's investigation. But such disagreement does not prove that FedEx's decision to fire her for falsifying her records was dishonest or not the reason for her termination, which is what is required at step three of the burden-shifting framework.

45

*Laing*, at 280. As with Laing, Sharif has failed to establish a genuine, triable issue of fact that could preclude summary judgment. By simply relying on conclusory statements and conjecture, all Sharif has proven is that he is dissatisfied with the conclusions reached by United from its investigation. As the District Court correctly concluded, even when viewed in a light most favorable to Sharif, none of his "evidence" demonstrates that United's decision to propose his termination for violating the company's Honesty Policy was false. (Mem. Op., JA 937 at 14.)

### 3. United's One Day Absence Policy is Irrelevant

Sharif argues that a reasonable jury could infer retaliatory animus from differences in how United disciplines employees who are sick or who miss a scheduled work shift without providing any notice in comparison to how United allegedly fired Sharif for missing work because of FMLA leave.[20] However, this "evidence" is hardly pretextual as Sharif alleges.

As the District Court correctly concluded, "the wisdom of a policy penalizing an employee who is a 'no show' with three points and an employee who violates its honesty policy with termination" is not within a court's province to decide. (Mem. Op., JA 937)(*citing Giannopoulos v. Brach & Brock Confections,*

---

[20] Employees who call out of a scheduled work shift because they are sick are given a one-point penalty. Employees who fail to call and show up for work or given a three-point penalty.

*Inc.*, 109 F.3d at 410). There is nothing in the FMLA that prevents an employer from ensuring that its employees who are supposedly on FMLA leave do not abuse their leave. *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 322 (6th Cir. 1998). Likewise, an employer can "rightfully consider workplace fraud a serious issue." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274 (6th Cir. 2012).

United didn't propose Sharif's termination because he took FMLA leave on March 30th for a permissible illness; it proposed his termination because it didn't believe that he ever intended to return in time for his March 30th shift and Sharif made misrepresentations during his interview with United's human resources manager.

### 4.  The District Court Properly Adhered to Rule 56 Standards

Sharif contends that the District Court failed to adhere to established Rule 56 standards in reviewing the evidence in the record. Sharif also contends that the District Court improperly gave weight to the testimony of interested witnesses. And, Sharif avers that the District Court improperly applied the honest belief standard.

As is clear from its Memorandum Opinion, the District Court properly considered all of the evidence before it – including the testimony of witnesses – and the District Court applied the applicable law in this Circuit for an FMLA retaliation claim. In essence, Sharif's criticism of the District Court's analysis

47

parallels his criticism of United's investigation: ***namely, Sharif's preferred course of action when all else fails is to blame the process instead of himself.***

Sharif's reliance on a bevy of policy laden arguments in his Brief underscores the general weaknesses in his case in chief. Other than conjecture and the conclusory allegations in his Amended Complaint (which, despite substantial discovery, he was unable to substantiate), Sharif has proffered no legally cognizable facts to support an argument on the merits.

Similarly, Sharif's protest that the District Court should have cast aside the testimony of Martin and Connor because they are "interested" witnesses reeks of hypocrisy and a blatant disregard of the evidence in the case. Certainly, it was well within the District Court's bailiwick to conclude that the uncontroverted facts (*e.g.,* Martin's and Connor's testimony, a trail of corroborating documentary evidence, and Sharif's own admissions) trumped Sharif's unsupported speculation and unsubstantiated conclusory allegations.

Under basic evidentiary principals, the District Court rightfully evaluated the evidence before it and determined that, even upon viewing Sharif's "evidence" in the most favorable light, he nonetheless failed to create a genuine ussie of material fact regarding United's proffered legitimate, non-retaliatory basis for proposing his termination. As such, the District Court's granting of summary judgment in United's favor was proper. *See Celotex Corp.,* 477 U.S. at 322.

Sharif failed to present any evidence that created a genuine issue of material regarding whether United's determination that Sharif failed to comply with its Honesty Policy was either unreasonable or unfounded based on the facts before United at the time.

## IV. THE UNSUPPORTED STATEMENTS IN SHARIF'S STATEMENTS OF FACTS MUST BE DISREGARDED

It is axiomatic that "facts" alleged by a party in opposition to summary judgment must be supported by citations to the record. It is not the responsibility of the Court to troll through the record in order to find support for a party's assertions. Sharif's Statements of Fact is defective in that it contains voluminous factual assertions that are not supported by any citation to the record and, indeed have no factual support. *See* Fed. R. App. Proc. 28(a) (Appellant's brief must contain a statement of facts with appropriate references to the record).

Additionally, Sharif's Statements of Fact contain misstatements of the evidence in the record. Such unsupported and/or inaccurate statements must be disregarded, including, but not limited to, the following:

- If an employee simply calls in sick, there is only a one-point penalty (Appellant Br. at 12.) This statement disingenuously ignores that pursuant to United's policy, Sharif would not have been able to utilize his free or discounted pass travel benefits while on personal/sick leave status, and Sharif needed those travel benefits in order to fly from South Africa to Italy and then return to the U.S. from his vacation.

49

- If Sharif had not made the telephone call to report that he was taking FMLA leave, he would still have his job and benefits (Appellant Br. at 12.)

- Martin relied on Sharif's FMLA leave in September 2013 when Martin decided to commence his investigation. (Appellant Br. at 14.) This statement inaccurately reflects Martin's testimony. Martin testified that he did not look into the September 2013 matter because Hasser's email gave him something relevant – *i.e.*, the March 30th absence – to investigate and Martin didn't want to go "backwards" and consider events from 2013..

- Martin could not tell anything from United's PDI information, and Martin testified that he "technically," didn't "know what it [meant]." (Appellant Br. at 15.) Despite Sharif's alleged "factual" assertion, Martin testified that the PDI provides the booked flights, dates of flight reservations, the date/time of the flight clearance at airport, and other similar items. Martin also testified that the PDI for Sharif's March/April vacation showed his flights from the U.S. to Kuwait then Milan, Newark and Dulles on the return flights. (Martin Dep., JA 315.) Furthermore, Martin explained that he didn't know what the acronym "PDI" technically stood for.

- When there was a disciplinary meeting, the union representative was supposed to get the employee and go to the meeting with the employee. (Appellant Br. at 16.) The CBA does not state such a requirement. (JA 254.)

- Martin conducted no further investigation into Sharif's conduct after he read Sharif's statement (Appellant Br. at 18.) This statement disingenuously ignores the fact that after reading Sharif's statement, Martin requested Sharif to provide proof of the alleged stand-by tickets he purchased on different airlines. (Martin Dep., JA 327). However, Sharif failed to provide such evidence for United to consider as part of its investigation.

- Merriman, the hearing officer, testified that despite overseeing five to seven IRHs in the past two years, all of his previous determinations upheld United's decision. (Appellant Br. at 23.)

50

Sharif's statement implies that the hearing officer always upholds the company's proposed disciplinary action, which is directly contrary to the undisputed evidence. Merriman testified that as a hearing officer at United, he has not always upheld the company's proposed disciplinary action. (Merriman Dep., JA 858). Furthermore, in 2009, United proposed a "Level 4" discipline against Sharif for violating a rule prohibiting employees from fighting, threatening, etc.; however, the hearing officer disagreed with the company's proposed discipline and determined Sharif should only be disciplined at a "Level 3." (JA 396 – 397.) Sharif also testified that the hearing officer in this matter could have decided to go forward with termination *or* could have decided not to terminate Sharif, and send him back to work. (Sharif Dep., JA 541:1 – 23.)

- Immediately following the June 5, 2014 IRH hearing, Connor said United would fire Sharif. (Appellant Br., at 23). Sharif's testimony is clear that after the hearing, Connor only proposed his termination. (JA 540 – 541.)

- United's Chairman issued Sharif a letter congratulating him on his decision to retire before he had made the decision. (Appellant Br. at 24.) However, Sharif testified that this statement is incorrect. Rather, Sharif notified the Union of his retirement prior to receiving the Chairman's congratulations letter. (JA 150, RFA No. 40); Sharif Dep., JA 222:6 – 13; *see* JA 759.)

51

## **CONCLUSION**

For the reasons set forth herein, Appellee United Airlines, Inc. respectfully requests that this Court affirm the judgment of the District Court in its favor and order the dismissal of Appellant Masoud Sharif's FMLA claim for the reasons stated herein.

Respectfully Submitted,

  /s/  H. Scott Johnson, Jr.

H. Scott Johnson, Jr.
Angela H. France
PCT LAW GROUP, PLLC
330 John Carlyle Street, Third Floor
Alexandria, Virginia 22314
Tel: (703) 881-9141
Fax: (703) 972-9153
sjohnson@pctlg.com
afrance@pctlg.com

*Counsel for Appellee United Airlines, Inc.*

Dated: December 7, 2015

## STATEMENT REGARDING ORAL ARGUMENT

Appellee United Airlines, Inc. ("United") respectfully states that oral argument will not assist this Court in its determination of the issues on appeal. The undisputed facts are adequately presented in the record on appeal, and this Court has previously established the controlling legal principles pertaining to the issues raised by Appellant Masoud Sharif and each of the *amici* parties.

Notwithstanding the above, United states that it is willing to appear for oral argument should the Court deem it necessary to its full consideration of the issues raised in this appeal.

    /s/  H. Scott Johnson, Jr.
H. Scott Johnson, Jr.
Angela H. France
PCT LAW GROUP, PLLC
330 John Carlyle Street, Third Floor
Alexandria, Virginia 22314
Tel: (703) 881-9141
Fax: (703) 972-9153
sjohnson@pctlg.com
afrance@pctlg.com

*Counsel for Appellee United Airlines, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,427 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point, Times New Roman font.

  /s/  H. Scott Johnson, Jr.
H. Scott Johnson, Jr.
Angela H. France
PCT LAW GROUP, PLLC
330 John Carlyle Street, Third Floor
Alexandria, Virginia 22314
Tel: (703) 881-9141
Fax: (703) 972-9153
sjohnson@pctlg.com
afrance@pctlg.com

*Counsel for Appellee United Airlines, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of December, 2015, a copy of the foregoing *Appellee's Brief* was filed using the United States Court of Appeals for the Fourth Circuit's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel for Appellant:

> R. Scott Oswald
> Andrea M. Downing
> The Employment Law Group, P.C.
> 888 17th Street, NW, Suite 900
> Washington, D.C. 20006
> soswald@employmentlawgroup.com
> adowning@employmentlawgroup.com

       /s/  H. Scott Johnson, Jr.
       H. Scott Johnson, Jr.